**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ROBERT L. ADGER, CALVIN L. ALLEN, HENRY J. ANDERSON, NATHANIEL BAGWELL, FENEL D. BAINE, DONALD F. BASS, JOSEPH N. BENNETT, DYMERE T. BERRY, SAMUEL B. BISHOP, MARQUIS BOYER- SMITH, JOHN BOYER, KEVIN C. BRATHWAITE, ALAN BROOKS, JARAD BROWN, MICHAEL A. BROWN, JUSTIN L. BURRELL, ~~LUIS G. CABRERA~~, STEPHANIE CABRERA, Personal Representative on behalf of THE ESTATE OF LUIS G. CABRERA, FRED T. CALDWELL, ALONZO I. CANNON, IVAN CARABELLO, MICHAEL A. CARELLO, AARON K. CARTER, ROBERT W. CHANDLER, FREDERICK O. CLIFTON, DONALD COLE, CURTIS M. COLLINS, KENJUAN CONGO, BRIAN CONLEY, CHRIS E. CRAIG, JOSEPH CRUMPLER, MAURICE CRUZ- WEBSTER, PABLO A. DAMIANI- MELENDEZ, JAMEL DANIELS, JERMAINE DICKERSON, GREG DICKSON, KRISHAN DILLARD, ANTWAN L. DOUGLAS, TEREK DOWNING, STEVEN DRAKE, DESHAWN D. DRUMGO, JOHN R. DUPREE, KURT DUPREE, JAMES J. DURHAM, JEFFREY R. FOGG, DAVID D. FOREMAN, DERIC FORNEY, ~~KYAIR J. FULLMAN~~, MONIR A. GEORGE, CHARLES T. GETZ, REGENT J. GODDARD, VICTOR GRANTHAM, KELLY L. HAND, THEODORE HARRIS,

C. A. No. 1:18-cv-02048 UNA

JURY TRIAL DEMANDED

CORNELL L. HESTER, SHAQUILLE K. :
JACKSON, ANTOINE JONES, MICHAEL :
E. KEYSER, CLAUDE LACOMB, JAMES :
LAWHORN, ALFRED M. LEWIS, JR., :
ANDREW D. LONG, DANA B. MARTIN, :
TYRONE MATHIS, JOHN C. MAYHEW, :
RICHARD D. MCCANE, KEVIN :
MCCRAY, DAVID MCCULLOUGH, :
EDWARD MCLAUGHLIN, MARVIN :
MENCIA, JOHN E. MILLER, KEITH J. :
MILLER, TONY MOZICK, LAMONT L. :
NORMAN, ~~ANTHONY J. ORTIZ~~, :
DONALD D. PARKELL, EZRA S. :
PENDLETON, HASSAN J. PERRY, :
CHRISTOPHER PORTER, MILLARD E. :
PRICE, MARK C. PURNELL, LOUIS W. :
RITTENHOUSE, ANDRE A. RIVERA, :
MARCUS ROSSER, BEN ROTEN, RON :
ROUNDTREE, LARRY J. SARTIN, :
RAYMOND Q. SAWYER, DANIEL E. :
SCHULTZ, JOSHUA D. SEARS, :
SYLVESTER C. SHOCKLEY, ~~RYAN~~ :
~~SINCLAIR~~, DAVID R. SMITH, WADE T. :
SMITH, ~~RONALD L. SNEAD~~, RUSSELL :
E. STEEDLEY, LAMONT E. :
STEVENSON, DARRIN L.SWIGGETT, :
NIGEL C. SKYES, GERARD E. :
SZUBIELSKI, HENRY R. TAYLOR, JR., :
ELWOOD E. TEAGLE, ORIN L. :
TURNER, ~~GABRIEL J.WALLACE~~, :
JOSEPH WALLACE, LIONEL M. :
WALLEY, HOWARD A. WALSH, :
JAMES G. WELLS, MICHAEL L. WELLS,:
CHRISTOPHER H. WEST, KEENAN :
WHEELER, EUBANKS WHITE, :
EUGENE W. WIGGINS, DENNIS O. :
WILLIAMS, RONALDO WILLIAMS, :
CLIFF WILSON, RAYMOND H. WOOD, :
RICHARD WOODARD, ROBERT L. :
WORLEY for themselves and all others :

similarly situated, :
:
Plaintiffs, :
:
v. :
:
GOVERNOR JOHN CARNEY, :
FORMER COMMISSIONER ROBERT :
COUPE, COMMISSIONER PERRY :
PHELPS, WARDEN DANA METZGER, :
WARDEN DAVID PIERCE, WARDEN :
TIMOTHY RADCLIFF, DEPUTY :
WARDEN PHIL PARKER, DEPUTY :
WARDEN JAMES SCARBOROUGH, :
WARDEN ROBERT L. MAY, JR., :
MAJOR JEFFREY ~~CARRUTHERS~~ :
CARROTHERS, CAPTAIN BRUCE :
BURTON, LT. JUSTIN ATHERHOLT, :
LT. NATHAN D. ATHERHOLT, LT. :
JASON T. COVIELLO, LT. GEORGE J. :
GILL, LT. MELVIN B. HARRIS, III, LT. :
KAREN HAWKINS, LT. SEAN R. :
MILLIGAN, LT. JAMES P. :
SATTERFIELD, LT. LARRY SAVAGE, :
LT. CHARLES D. SENNETT, JR., LT. :
TEDDY D. TYSON, SGT. WILFRED :
BECKLES, SGT. LAWRENCE O. :
COVERDALE, SGT. TODD SCOTT :
DRACE, SGT. JOHN R. FAULKNER, JR., :
SGT. RONALD FREDERICK, SGT. :
VINCENT E. HAZZARD, SGT. VINCENT :
MAY, SGT. KEVIN R. MCKENNA, SGT. :
ROBERT MOCK, SGT. CHARLES H. :
RADCLIFFE, SGT. DENNIS P. RUSSELL, :
CPL. NATHANIEL C. PAYTON, CPL. :
DALE LEE RAINS, C/O MICHAEL J. :
ARABIA, C/O PAUL O. BARONE, C/O :
JOSHUA A. CONNOR, C/O WILLIAM :
ESTRADA, C/O JACK EVANS, C/O :
NORMAN FIGUEROA, JR., C/O BRETT :

FORAKER, C/O LANCE N. GREEN, C/O :
RICHARD L. GRIFFITH, C/O MICHAEL :
CHESTER LANDON, C/O JOSHUA :
PEPPERS, C/O THOMAS PATRICK :
RUNYON, JR., C/O JOSHUA D. :
STEWART, C/O ABIGAIL WEST, C/O :
TIMOTHY R. YOUNG, and C/O AARON :
FORKUM, :
:
Defendants. :

**AMENDED COMPLAINT UNDER CIVIL RULE 23 FOR A CLASS ACTION FOR DAMAGES AND INJUNCTIVE RELIEF**

1. At all times relevant to this action, the plaintiffs were inmates at the James T. Vaughn Correctional Center in Smyrna, Delaware (JTVCC), a high-security prison that the State of Delaware operates through its Department of Corrections (DOC).

2. At all times relevant to this action, the individual defendants were acting under color of state law.

3. All defendants are being sued in their individual capacity for damages and in their official capacity for injunctive relief only.

## BACKGROUND

4. On February 1, 2017, a small minority of the inmates housed in JTVCC building C-19, seized control of the building and took hostages. For many years prior to February 1, 2017, it was no secret that there were correctional officers (C/O's) at JTVCC and other DOC prisons who illegally abused, mistreated, and tortured

inmates with virtually nothing being done by their JTVCC or DOC supervisors, to stop them. Inmates and others repeatedly complained about abuse, the increasingly unavailable healthcare, and the increasing scarcity of education, rehabilitation, and recreation options for inmates. These complaints were sent to the highest levels of DOC administration and to the government officials with oversight of DOC, yet DOC supervisors did not discipline the abusing officers, made no attempt to provide rehabilitation or education opportunities to inmates who wanted them, and permitted the healthcare to get so bad, that many inmates are getting no care for serious health issues.

5. The elected officials with oversight of the DOC, including governors, ignored all of the complaints that the Department of Correction was simply warehousing inmates, allowing correctional officers to abuse them, providing them with very little rehabilitation or education, and denying them adequate healthcare for serious injuries and illnesses. The officials in Delaware who should have been protecting inmates and correctional officers from the danger of out of control prisons, did nothing to protect either group. They have ignored the indisputable fact that prison systems with competent management who offer inmates appropriate education, rehabilitation, recreation and health care services are much safer for inmates and correctional officers and have lower recidivism rates. As a result of the

neglect of Delaware prisons, the conditions in Delaware prisons has deteriorated to the extent they are now considered some of the worst in the country.

6. The Governor and the Delaware Attorney General (AG) do not investigate the complaints they get about the abuse of Delaware inmates, but simply refer the complaints back to DOC, which has never shown any real interest in ending the abuse of inmates. The AG's office knows about thousands of these complaints because the AG's deputies defend the abusive officers when lawsuits are filed against them. Despite the knowledge that there is repeated pattern of abuse by these C/O's, the AG's office does nothing to protect the basic human and civil rights of the men or women in DOC's custody. To date, there has been no call for comprehensive outside investigations of the myriad of allegations or mental, physical, and sexual abuse of inmates in DOC prisons by any AG or governor.

7. DOC inmates, quickly learn that no government agency in Delaware protects the civil rights of the residents of Delaware, be they inmates or not, if the perpetrator is a state employee. Furthermore, the state and federal courts have consistently given the state of Delaware the benefit of the doubt in lawsuits alleging civil rights violations by Delaware authorities, leaving inmates with virtually no remedy for the long-standing patterns of civil rights violations by DOC.

8. The inmates at JTVCC understood that no Delaware state agency was listening to them about the increasingly volatile situation at JTVCC, and that failure

to listen to them made an incident like the revolt at C-19 inevitable. JTVCC leadership was specifically warned that something bad was going to happen but did nothing. Former prison counselor and hostage, Ms. May has been quoted by AP reporter Randall Chase as saying:

> “It was common knowledge that the riot
> Was going to come about,”

she added.

> “We just didn’t know when.”

She also told Mr. Chase that she believed she had knowingly been placed in a dangerous situation by the prison leadership:

> “They knew it was going to happen. They
> did nothing. When they put me in that building,
> they knew they were putting me in a dangerous
> situation. “

Her statements are supported by the final review as summarized in the same article by Mr. Chase:

> “But the review found that prison administrators
> dismissed warnings of trouble, including Floyd’s
> plea to move some inmates to another building
> for security. That was indicative of an overcrowded,
> understaffed facility plagued by mismanagement,
> poor communication, a culture of negativity, and
> adversarial relationships among staff,
> administrators and inmates, investigators found”

https://www.seattletimes.com/nation-world/apxprison-reforms-touted-riot-survivor-urges-serious-changes/

9. The PRELIMINARY REPORT: INDEPENDENT REVIEW OF SECURITY ISSUES AT THE JAMES T. VAUGHN CORRECTIONAL CENTER was commissioned by the Governor John C. Carney on February 14, 2017. Inconsistencies between the way different C/O's interpreted the rules, and the fear of retaliation if they complained (for C/O's and inmates), were problem areas pointed out in the report:

> "Officer discretion was the leading factor in how the tiers operated each day and on each shift. Due to inconsistencies from shift to shift and officer to officer, the inmates had little or no structure and were given different answers by correctional officers in response to their questions regarding the policies and procedures they were expected to follow. The lack of effective communication and inconsistent operations within the housing unit became a point of contention among the inmates. More than one inmate stated that consistency in following procedures was more acceptable than inconsistency, which seems to be the prevailing norm. (FN omitted) Officers and inmates are concerned about retaliation if they report an officer for not enforcing the rules appropriately or ~~preforming~~ performing their duties unprofessionally".

10. The situation at C-19 was an increasingly unstable explosive mixture, prior to the revolt, and the prison leadership's indifference to that increasing danger, ultimately resulted in a revolt and the tragic death of a correctional officer. The revolt

caught the attention of Delaware's elected and appointed officials, who finally acknowledged that there were serious problems in Delaware's prisons. Unfortunately, rather than investigate and address the root causes of the dangerous conditions in all Delaware prisons, Governor Carney's first plan to address prison conditions, called for $11.5 million to be spent on modernizing equipment and hiring more correctional officers. While those things were needed, they were not the primary cause of the revolt.

11. The primary demands of the inmates who participated in the revolt were: better healthcare; more educational opportunities; rehabilitation services that were effective; and the end of the unjustified abuse and disrespect of inmates by C/O's. They also wanted the record-keeping department to be upgraded so that men would get released on the proper date, and not held long after they should have been released as has been happening for many years with DOC's knowledge.

12. The abuse, mistreatment, and torture of plaintiffs by correctional officers and all those similarly situated prior to February 1, 2017, regularly included, but was not limited to:

a. verbal and physical abuse of inmates;

b. threats, obscenities, and slurs directed at inmates based on their ethnic background or perceived sexual orientation;

c. unjustified seizing, disposing of, or destroying inmates’ personal property often in retaliation for inmates’ reporting improper or malicious conduct by correctional officers;

d. ignoring or disbelieving inmate’s complaints of physical abuse and the destruction of their property without conducting any meaningful investigation;

e. allowing the medical and mental healthcare vendors to regularly delay or deny medical and mental health care for inmates suffering from serious conditions that untreated can cause serious permanent injury, or even death;

f. causing inmates to be held at JTVCC for days, weeks, or even months past their release dates because of DOC’s disorganized misplacement of inmate documents and records;

g. continuing the elimination of rehabilitation programs and educational opportunities;

h. permitting arbitrary often retaliatory disciplinary actions against inmates, often as a cover for abuse by C/O's, causing inmates to lose privileges and good time;

i. permitting C/O's to lie about alleged abuse of inmates and the inmates alleged possession of contraband, knowing that they almost always will be believed, and even if they are not, will stand little chance of losing their job.

j. allowing the C/O's in charge of each shift to enforce their own sets of rules so that rules for inmates continually change depending on the ~~shit~~ shift and who is on duty. Not surprisingly, inmates often inadvertently violate rules they didn't know about and get disciplined for doing so;

k. allowing hearing officer Lt. Savage and other hearing officers to determine that inmates were always guilty in any disciplinary situation without conducting any actual hearing;

l. forcing C/O's officers to work excessive overtime, making them tired and impatient with inmates, and more likely to initiate altercations with them;

m. allowing healthcare provider, Connections, to become increasingly unable or unwilling to provide necessary medical and mental health care to the inmates;

n. causing a concentration of alleged gang members and abusive C/O's to accumulate in C-19 and ignoring the warnings from Floyd, other DOC employees, and inmates that a serious incident was imminent.

13. The revolt undoubtedly could have been prevented if not for incredibly poor judgment and lack of leadership by the supervisors at JTVCC. If Major Carruthers and others had heeded the warnings by Sgt. Floyd, the revolt most likely would not have occurred. It could have been ended early, had DOC and State officials allowed the team assembled by Warden Pierce to retake the building not long after the revolt had started. It could have served as a warning for DOC to change its ways and prevent another revolt had DOC addressed the problems that actually caused the revolt. However, DOC's response was to remove a few supervisors from JTVCC, some of who were given other government jobs at the same pay. None of the worst offenders responsible for the torture of inmates has ever been disciplined,

and most are still working at JTVCC. There has been no investigation of the inmate's allegations of torture nor has DOC addressed their other demands in any significant way.

## THE REVOLT

14. At about 10:20 AM on February 1, 2017, roughly five to seven JTVCC inmates revolted and seized control of the JTVCC building C-19. A vast majority of the inmates in C-19 did not incite, encourage, or otherwise participate in the revolt. The inmates involved in the revolt, seized three correctional officers and a counselor. Lt. Senate and some C/O's with him were at the scene soon after the revolt started, but rather than try to rescue Floyd and the other hostages, they opted to run from the scene as soon as they observed blood on the floor, walls, and bars.

15. Warden Pierce had assembled a team from JTVCC that was prepared to retake C building not long after the revolt started. Based on past experience it was entirely likely that a team equipped like a CERT team is normally equipped, could have discharged pepper spray at the revolting inmates and then moved in and rescued the hostages. Inmates are not equipped to withstand pepper spray and the effect of it would have put them at a great disadvantage to the riot gear clad CERT team and unable to withstand their assault. Unfortunately, this plan was overruled, and it wasn't until the next morning that a very large assembly of correctional officers and police officers easily breached C building and rescued the remaining DOC hostages

without any resistance by the inmates. Upon having his plan disregarded, Warden Pierce, who under prior DOC practice and procedure should have been in charge of the rescue effort, is believed to have left the prison grounds. He was replaced as the official in charge by Robert May, who subsequently was promoted to Warden of Sussex Correctional Institution. Warden May participated with the rest of the officials who planned on February 2, 2017 assault on C building, and like them knew that the correctional and police officers retaking the building were going to brutalize the inmates. Also like them, he directly or indirectly approved of such behavior and made no attempt to stop it.

16. The inmates not involved in the riot were terrified of the inmates who were involved in the revolt. They feared for their lives if they didn't cooperate. So, when ordered to empty their locker boxes, place them outside of their cells in the hallway, and to go to their cells and stay there, they did. The front door was barricaded, and the inmate hostages were told to cover their cell windows. A fire was started, resulting in the activation of the sprinkler and alarm. For approximately 18-20 hours, the inmate hostages were expecting that they would be rescued by correctional officers.

17. DOC counselor May, and three C/O's including Floyd, were taken captive. Counselor May had a reputation as someone who would advocate for the inmates, and consequently she was protected from harm by inmate hostages. Sgt.

Floyd, whose reputation consisted of persistent and frequent harassment and abuse of inmates and their visiting families and friends, was not protected but killed, presumably because of his reputation.

**FEBRUARY 2, 2017**

18. **~~5~~5:30 AM:** DOC correctional officers (C/O's) including the DOC Correctional Emergency Response Team (CERT), and Delaware and Maryland State Troopers acting on behalf of DOC and the governor of Delaware, dressed in full riot gear, breached the front entrance and easily regained control of C-19. Hereinafter all troopers and C/O's who together helped retake building C-19 will be collectively referred to as "CERT". CERT members wore masks and no name tags when they entered C-19 to hide their identity and intimidate the inmates. CERT made no effort to determine which inmates were actively involved in the revolt versus those who were actually hostages.

19. CERT hollered instructions to the inmates from outside their cells and told them to lie on the ground with their hands behind their backs and the inmates complied. Yet as soon as each cell door was opened, CERT members jumped on the inmates' backs, put extremely tight zip-ties on their wrists, and kicked, stomped, stood on, and spit on them. They also abused the restrained, passive inmates with batons, pepper spray, and electrified riot shields while threatening to kill them if they

resisted. CERT made sure that the most vicious assaults on these defenseless men took place in their cells, so as to limit the number of potential eye witnesses.

20. **6:30 AM - 7:30 AM:** CERT began moving men from the yard to the infirmary around noon and mocked any man who asked for medical attention for his wounds or other injuries. The nurse was allowed to examine each man for only about 20 to 30 seconds, so the many men who were bleeding or were in pain from being beaten, received no evaluation or treatment. Nurses were unable to even check some men's blood pressure because the zip ties were too tight, causing their hands to turn blue. The men were then taken to the gymnasium with their hands still zip tied behind their backs. Around **12:15 PM** CERT started to take men to booking where their identification was verified. Lt. Satterfield finally ordered looser constraints be applied after he noticed over-tightened zip-ties were cutting off inmates' circulation.

21. After the beatings CERT would yank the men to their feet and forcibly move them out of the building in herd-like fashion, heads facing down, arms forced upward behind their backs as far as the officers could force them, and each man's chest against the back of the man in front of him. The men were drug to the paved yard outside the building and forced to lie face down on pavement with their hands still zip-tied, some wearing boxer shorts, and no shoes. The CERT officers refused to loosen the unnecessarily tight zip ties even when inmates complained that they were losing feeling and/or circulation in their hands.

22. CERT continually berated the inmates and threatened them with further physical violence as they moved them from building to building or when they took them outside into the frigid winter air and forced them to lie on the frozen ground. They also forced the inmates to disrobe in groups and spread their buttocks with their hands, and then put those soiled fingers into their own mouths and pull their mouths open further. Some officers touched multiple inmates' genitals, buttocks, and mouths while wearing the same gloves. This abuse was often done with female officer's present, and both male and female officers laughed at the inmates during the abuse.

23. Eventually after the men who were hostages in C-19 building were all beaten, threatened, mocked and abused by CERT, they were dragged across the prison yard to the maximum-security unit, where CERT beat them all again.

24. Throughout the day on February 2, 2017, CERT continued to physically and verbally abuse the restrained incapacitated men who had been hostages in C-19, by:

a. punching and kicking them, striking them with batons or other similar objects;

b. jumping on them and then sitting or lying on them in order to inflict pain;

c. discharging pepper spray directly into the mouths, noses and eyes;

d. shocking them with shields equipped with Taser like capability;

e. overtightening shackles, cuffs or zip ties with the intention of causing them pain;

f. tripping, pushing, and shoving them while cuffed and unable to protect themselves when they fell to the ground;

g. strip searching them in groups, sometimes in front female officers;

h. abusing and humiliating them by making them touch their rectal and genital areas and then put their hands in their mouths;

i. pulling their cuffed arms up behind their backs as far as possible to cause pain;

j. forcing them to stand or sit cross-legged in one position for extended periods of time, typically while facing a wall.

k. using almost constant profanity, including racial slurs and homophobic comments when speaking to them. Especially during strip searches and threatening to kill them if they resisted.

25. On February 2, 2017 the CERT participants made a mockery out of DOC policy 8.30 regulating use of force against inmates. Section V of the policy states in part:

> "The use of force must be reasonable under the circumstances and should be used only when no other reasonable alternative is available. If possible, staff shall take reasonable steps to deescalate a situation or otherwise prevent the need to use of force. The use of force may not be used as a retaliatory or disciplinary measure.
>
> "Physical instruments of restraint (handcuffs, shackles, chains, etc.) of any type shall not be applied as punishment.
>
> "Use of excessive force by the Department employees or other persons is prohibited. Any violation of this policy may result in disciplinary action, up to and including termination".

26. On February 2, 2017 the CERT participants also made a mockery out of DOC policy 8.32 regulating the use of strip searches. That policy states in part:

> "PROCEDURES:
>
> A. Strip Searches
>
> 1. Strip searches will be conducted for security purposes only. The search shall never be done for punitive purposes or as a form of harassment.
> 2. All offenders are subject to strip search when:
>
> h. There is reasonable suspicion that contraband is present.

14. The following search plan shall be followed when conducting a strip search. After the individual removes his clothing, he officer will examine:
    a. Pockets;
    b. Linings, seams, collars, cuffs, waistbands and fly;
    c. Socks, shoes, including soles and heels;
    d. False teeth, artificial limbs, soft and plaster casts;
    e. Hair, wigs and hairpieces;
    f. Ears, nose, mouth, underarms, skin folds, hands, fingers, feet and toes; and
    g. All genitalia including: penis, testicles, anus, groin…"

The Procedures and Policies Manual of DOC apparently is no longer applicable to DOC employees and agents as they no longer seem to make any effort to adhere to it when interacting with inmates, especially those men who were in building C.

27. Every unusual event at a DOC facility is supposed to be noted in incident reports written by DOC employees or agents, like those working for Connections or the police, if they witnessed the unusual event. The reports can be written sometime after the event if there was no time to do it earlier. Any use of force must generate a Use of Force report as well. However, we have learned that the CERT members who very easily retook building C, and then went cell to cell torturing non-resisting inmates are claiming they didn't have time to write use of force reports. No doubt such use of force reports would be helpful in determining where the blood came from that was seen on the ground and floors after the CERT members took the inmates out of C building, and then put them in the gym, or SHU. Time was not the issue for the CERT members, because once they took over

C building they had as much time as they needed to process the inmates and write reports. The failure to write reports was really about covering up their criminal behavior.

28. Many of the housing units in maximum-security to which the inmates were taken were unheated and contaminated with human waste. The inmates had no property except the clothes on their backs, and for days the officers denied them necessities such as bedding, footwear, soap, toothbrushes, clean clothes, toilet paper and adequate food. Most inmates received no medical care, or mental health care, other than a brief check to make sure they weren't suicidal, for a month or more. After the first day of beatings, CERT continued to harass and abuse inmates who were in C-building, and then expanded to abusing inmates who had not been in C-19.

## DOC EMPLOYEES AND AGENTS BEGAN TO SYSTEMATICALLY TORTURE THE MEN WHO WERE INMATE HOSTAGES AT JTVCC BUILDNG C-19 BEGINNING ON FEBRUARY 2, 2017

29. The following men, plus many others not named here, were held hostage in JTVCC building C-19 from February 1, 2017 until the early morning hours of February 2, 2017 when correctional employees and agents of DOC, including state troopers from Delaware and Maryland, entered the building and began torturing them. The torture lasted throughout the day, with the knowledge and approval of every named defendant.

Calvin Allen
Henry J. Anderson
Fenel D. Baine
Donald F. Bass
Joseph N. Bennett
Kevin Berry
Samuel B. Bishop
John Boyer
Kevin C. Brathwaite
Justin L. Burrell
~~Luis Cabrera~~

Ivan Carabello
Michael A. Carello
Robert W. Chandler
Frederick O. Clifton
Kenjuan Congo
Jamel Daniels
Jermaine Dickerson
Greg Dickson
Antwan L. Douglas
DeShawn Drumgo
Kurt Dupree
Jeffrey R. Fogg
Deric Forney
Victor Grantham
Kelly L. Hand
Cornell L. Hester
Richard McCane

Edward McLaughlin
Marvin Mencia
Ezra S. Pendleton
Millard E. Price
Mark C. Purnell
Louis W. Rittenhouse
Marcus Rosser
Ron Roundtree
Larry J. Sartin
Joshua D. Sears
Luis Sierra
David R. Smith

Wade T. Smith
Russell E. Steedley
Lamont E. Stevenson
Elwood E. Teagle
Lionel M. Walley
Howard A. Walsh
James G. Wells
Michael L. Wells
Eubanks White
Eugene Wiggins
Dennis O. Williams

Ronaldo Williams
Cliff Wilson
Richard Woodward
Robert Worley

30. The excerpts below are compiled from the statements of men who were in their cells when CERT entered and attacked them, and from statements of men who had been released as hostages on February 1, 2017. CERT restrained them, beat them, and abused them in much the same way they eventually abused the remaining hostages:

a. “I was on my face, hands behind me when CERT came into my cell and zip-tied my hands painfully tight. They took my glasses off my face and stomped on them, then sprayed pepper spray in my eyes, nose, and mouth. While I remained restrained on the floor they began to kick and stomp on me asking me if I killed Floyd. I told them “no” but they kept beating me. I thought they were trying to force a false confession out of me. Finally, they took my sneakers off my feet and drug me at a fast pace through the water in the hall in my socks. I couldn’t keep up the fast pace, lost my balance and slammed into a metal device on the wall which cause a dent in the right side of my skull. I was taken to the C-building yard and made to lie face down on the cold concrete for a long period of time. CERT then took me to the infirmary where I told the medical person I was pepper sprayed, could not see or breathe right, the zip ties were hurting my wrists, and I was hurting

all over from being beaten. I also requested to see mental health because of my psychological state. A C/O told the medical person "too bad he needs to man up". The visit with medical was very short and I was taken to the gym and left on the floor for a long time. Eventually the pepper spray wore off enough that I could see the people lying on the gym floor around me, many of whom were moaning and had blood on their clothes.

"Eventually I was taken to a cell in the Super Max Housing Unit (SHU), where I was denied things such as a blanket and sheets, proper food, shoes, toiletries, writing supplies and showers for days or weeks. I had tied up most of my property in sheets and blankets in C-building. It would have been easy to identify my property, but it was not returned to me, I was not seen in sick call for my physical injuries until February 17."

"The sick call medical note does not disclose that I was beaten by CERT, although part of the note has

been redacted by DOC. DOC historically rarely redacted any medical notes, but since the revolt DOC is redacting a lot more notes than it used to. It appears that Connections, the medical provider for DOC, might be cooperating with DOC to try to cover-up the beatings the men suffered at the hands of CERT. The diagnosis code on the encounter form for the February 17, 2017 sick call visit is:

> " V68.9 Encounters for unspecified administrative purpose. Unspecified occupant of heavy transport vehicle injured in non-collusion transport accident in traffic accident"

However, the note written by a mental health worker doing "SEGREGATION ROUNDS" on February 16 recorded that the inmate stated "… he was beat up and he did nothing to deserve what happened to him and he is very upset at this time." SEGREGATION ROUNDS are for inmates in solitary confinement and the mental health worker has a brief conversation through the bars with inmate to make sure he is not suicidal.

b. I was in my cell face down on the floor with my hands behind my back when the cell door opened,

and I heard someone say, “Don’t move M****r F****r”, they zip-tied my wrists, and someone began kicking my legs and someone else began punching the back of my head, my ears, and the right side of my face. I was lifted to my feet, pushed out the door and “punched in the gut”. As I was pushed down the hallway past armed officers lined up along the hall, they punched and kicked me. As I got near the door I was thrown into a chain-link fence and told to “stop resisting” even though I had been fully cooperative. Once outside, I was told to “get down on your f*****g knees” and as I was getting down I was pushed from behind and my head, face and ear hit the asphalt. I told an officer that the ties were cutting into my wrists. In response the officer stood on my back and wrists and told me to shut up. Eventually I was taken into the infirmary through the back door where I noticed a puddle of blood, spit and vomit on the floor. Someone from medical staff asked

my name where I was hurt etc. I told them my sides, head and ears hurt and I could not feel my hand. At most it took about 30 seconds, and nothing was done for my injuries. The officers taking me out of the infirmary held my arms up behind I back as far as they could while pushing me along, one of them kept pushing my head toward the ground. I could hardly breathe, and my pants were at my ankles tripping me. Eventually I was put in a cell in SHU with another inmate who had also been beaten. I was wet, dirty and bleeding. I was given nothing but a plastic-coated mat to lie on. Soap and toilet paper came late the following day and clothing and a bed sheet a few days later. It was about a week before I was allowed out of the cell to shower and use the phone. I did not receive any medical attention until February 22. By then most of my bruises cuts and scrapes were healed over, but I was still having back and neck pains and difficulty hearing in my

right ear. The nurse said it was red and swollen inside. I believe I had a concussion, as I was dizzy, tired, lightheaded and vomiting for a day after the incident."

c. "I was locked in my cell and he had all of my belongings packed up and wrapped in a blanket. Once I heard the police come in my tier, I was lying face first on the ground with my hands behind my back while I was waiting to be saved from my situation. When the police came in, one of them put zip ties around my hands, put his foot on my back for leverage and pulled out as hard as he could. Within the first 30 seconds I began to have no feeling in my hands. Someone stood on my head with their two feet. I then turned my head to the side of my left cheek, so my nose wouldn't be broken. I then felt them taking my shoes and socks off then they took my sweat pants which left me barefoot with just my long johns and shorts on. When I positioned my head, so my nose wouldn't

be broken they screamed "stop resisting" and I felt kicks from everywhere. I was then hit with a metal instrument~~,~~ I believe~~d~~ to be a night stick three times. One to the forehead and one to the back of ~~his~~ my head. This left me unconscious for about 20 seconds and the third blow woke me up and then I was yanked to my feet and was pushed over the toilet causing me to fall. I was then yanked to my feet again and was escorted through the flooded hallways barefoot. They took me to the recreation yard where I was laying down on the cement floor for an hour. I could no longer feel my hands due to the zip ties being so tight. I also could not feel my feet due to the freezing temperature and I shivered uncontrollably. I eventually went to the infirmary where mental health checked me. There was blood all over my face and head, which did not concern anyone. I was not able to move my hands due to no blood circulation. I was then taken across the compound to the gym where I was

laying on the floor for another 2 to 2 ½ hours bleeding in pain still zip tied. About after the first hour and a half, a C/O finally came to my aid to put new zip ties on me that were loosened and then I was transferred to the booking."

d. "They busted into my cell yelling "don't f**king move" and stomped on the back of my head. They put their foot on my neck and cuffed me with zip ties and made them tight so that my hand was blue and numb. Then they dragged me out of the cell where there was water on the ground. They were lifting me up before I got to my feet and they punched me in my face three times. They snatched my glasses off and snapped them in half. I said, "Why the f**k yall do all that, I'm a hostage" and they replied, "Shut the f**k up" and sprayed mace in my face. The side of my face was swollen, and my mouth was bleeding. They took me outside in the 30-degree weather and slammed me on the concrete. Then they walked me to the Nurse area

but didn't check my swollen face or bleeding mouth. Instead they just checked my blood pressure, but the zip ties were so tight that the nurse could not take my blood pressure. The nurse told them to take the zip ties off and they complied, and she took my blood pressure. They then put them back on tight to the max. I was dragged out of the Nurse's station to the gym and slammed on the ground again.

e. "I was 54 years old. I was beaten and dragged from the cell to the yard. I was severely injured and admitted to the prison infirmary for seven days under observation. My back and neck constantly hurt."

f. "I was stomped, kicked, badly beaten, and suffered serious lower back injury and had a silent heart attack. Medical staff is trying to cover it up by saying it was only an anxiety attack and gave me Motrin Pills and threw me in Maximum Isolation for one month without any medical

treatment. My blood pressure was very high the date of the prison takeover. I have submitted over ten medical grievances and still have not received medical attention or help. I can't even sit up straight because the pain in my lower back hurts so much. I have been laying down every day for one month with no medical help. "I was also supposed to receive medication to help me stop vomiting up blood, but the Nurse Practitioner failed to give me that medication also."

g. "Officer came to my cell and I was already laying on the ground with my hands to my head, so I would not get beat. The officer put his knee in my back, grabbed my hands and zip-cuffed him. I said "Ow." The officer replied with "Shut up N****r" as I was sprayed up my nose and my head were slammed three times on the floor." "The officer then began to pick me up by pulling my hood, which he twisted so it was choking me. As I got to my knees the officer slammed my head

on the side of the sink, and then said, "Say something now tough guy." As he began lifting me by my hood again choking me, he said to the other cop, "This one here has a lot of mouth. "Then the other cop standing at the door to the cell punched me in the throat. As I got out of the cell while being choked by the hood, I was tripped by another cop. I fell to the ground on face and several cops kicked me in the face, chest, back, and stomach. Then I was pulled back up by the cop who still had the hood of my sweatshirt choking me as he said "Don't fall again you f*****g p***y."

h. "After CERT ended the hostage situation they zip-tied my wrists and threw me face down on concrete and Sgt. Gill repeatedly kicked me in the back. When Gill lead me to the infirmary he punched me in the back."

i. "They beat me up and fractured my nose. They left me in the gym for hours with hands cuffed

behind my back laying on my stomach. I as moved to building 19 and I had only boxer shorts no shoes or socks. I did not see a doctor until February 24."

j. "Initially they pepper sprayed me, threatened me, caused me to run into the wall head first, kneed me in the back, put me in isolation for 10 days, I got no medical treatment until sometime in March."

k. "The CERT team came to my cell and took my celly out the cell first, kneeing him and punching him. The officer next to me grabbed my hands and cuffed me extremely tight, then kneed me several times on my lower back. The second officer on my left side starts punching me on my head and face maliciously and sadistically saying "You should have gotten out when you had the chance m*****r f*****r." This left me severely bruised and with my left eye swollen shut. I was being compliant and did not resist. The officers

then took my shoes off, grabbed me by the arms and lifted me, dragging me out of my cell. I felt dazed and confused and could barely walk through the flooded hallways. I was dragged outside to the yard and they threw me on the concrete floor. I was on the cold floor with wet clothes for over 30 minutes. After this period of time, they grabbed me by my arms and lifted me off the ground and was taken to the infirmary. A couple of nurses asked ~~him~~ me how ~~he~~ I felt, and ~~he~~ I replied, "My head hurts really bad and can't feel my hands." The left side of ~~his~~ my face feels numb."

1. "Injuries caused by CERT were ignored. My original request was ignored because I related it to abuse by CERT. I was only given treatment after I sent a second request and gave a different reason for my problem."

m. “I was beaten and suffered a concussion after which I spoke to some investigators. My memory is now shaky, and I can’t remember their names.”

n. “I am an insulin dependent diabetic and did not get insulin for three days. I was very weak and shaky and sweating really bad.”

o. “It took four months for one of my medical grievances to get a response and for me to see a nurse or doctor.”

p. “I was released early as a hostage then beaten, abused and thrown in solitary. A month later I still had not been treated for my injuries.”

q. “I recognized Lt. Senate’s voice on 2/2 and remember him threatening me because I couldn’t bend forward due to my bad hips.”

r. “The CERT team burst into my cell and crushed me, which caused my head to hit the wall. My cellmate’s head was slammed to the ground. The C/O ~~on~~ could not get the zip on me so he jumped on me with force and zip tied me like a hog.”

s. “My face was slammed on the pavement causing me to have facial abrasions and swelling that took over a week to heal. The officers also stepped on my left hand, jamming one of my fingers to where I can’t fully make a fist.”

t. “C/O Payton came up behind me and said in a whisper, “It’s me Payton,” and then punched me in my arm and squeezed my shoulder blades. He also grabbed two of my fingers and tried to break them. Furthermore, when the CERT team into my cell on the morning of February 2, 2017, around 5 am, I was stomped and kicked in my back, arms, head, and hands. I was then lifted up by my legs and dragged into the hallway where I was stomped and kicked again. When I was taken to my cell at booking, C/O Payton told me they are going to convict me for murder. “You’re going to have to spend the rest of your life in here with me.” Then he asked one of the other C/O’s “Is there any cameras?”

"Then Payton punched me in the jaw. He looked at my headwound and said, "What, that happened from sucking some c**k." Then he dabbed his finger in my wound. As he was leaving out, C/O Payton did bend and twist my arms and said "Let's go, get your ~~fata**~~ fat a** up n****r.

"I was outside waiting for them to bring another inmate out, then C/O Payton said "Kneel." I said "What?" C/O Payton then said, "Get on your f*****g knees n****r, get on your f*****g knees now." Then Payton twisted my cuffs and arms. I was walking to Building 19 and Payton slammed my head in a door."

u. "The nurses were initially told by DOC administration not to see anyone or treat anyone."

v. "Several mental health workers told inmates they would like to help but JTVCC won't let them counsel inmates."

w. "Officers kicked me in the eye, punched me in my head, hit me with a stick on my arm, and threw

me all around the room. I was taken to the rec yard and pushed to the ground that was cold."

x. "I was badly beaten and suffered a large gash over my eye and had other face, head, and neck injuries."

y. "The guards are not allowing prisoners to have visits with family for four weeks…enough time for the bruises to go away."

z. "I heard inmates crying out in pain and screaming after CERT arrived."

aa. "The C/O's seemed to enjoy inflicting pain and now they had an excuse."

bb. "When CERT, DOC, Police came into C building they were wearing masks and had their nametags covered. They came into building C with the intention to do harm even if you weren't resisting. I was stomped, kicked, punched with fists, hit with riot gear weapons, and zip tied so tight I had visible bruise marks around my wrists. I suffered a concussion and abrasions on my face. I was

> made to lie down on my face about 45 minutes to an hour on the yard, and then taken to medical. The medical person checked my wounds and asked a few questions and then CERT dragged me to the gym. I never received my property from C building.

31. The following men were among the inmate hostages in building C-19 on February 2, 2017, and were forced to leave all of their property, except the clothes on their backs in the building when they were dragged out of C-19. Almost all of the property was disposed of by DOC employees or agents without any accounting for it by DOC. There are many other men who had property taken or destroyed during the CERT shakedowns. Many are not on this list but lost some of the same items as listed below. During shakedowns CERT invariably broke the hooks off the cell walls that the men had purchased from the prison commissary.

| | | |
|---|---|---|
| Calvin L. Allen | Antwan L. Douglas | Luis Sierra |
| Henry J. Anderson | DeShawn D. Drumgo | Wade T. Smith |
| Fenel D. Baine | Kurt Dupree | Lamont E. Stevenson |
| | Deric Forney | |
| Joseph N. Bennett | Victor Grantham | Elwood E. Teagle |
| Justin L. Burrell | Kelly Hand | Joseph Wallace |
| ~~Luis G. Cabrera~~ | Cornell Hester | Lionel M. Walley |
| Ivan Carabello | Edward McLaughlin | Michael L. Wells |
| Frederick O. Clifton | Marvin Mencia | Eugene W. Wiggins |
| Curtis M. Collins | Lawrence L. Michaels | Dennis O. Williams |
| Kenjuan Congo | Lamont L. Norman | Ronaldo Williams |

| | | |
|---|---|---|
| | <u>Donald Parkell</u> | |
| Pablo A. Damiani-Melendez | Ezrz S. Pendleton | Cliff Wilson |
| Jamel Daniels | Mark C. Purnell | Raymond H. Wood |
| Christopher R. Desmond | Louis W. Rittenhouse | Richard Woodard |
| Jermaine Dickerson | Marcus Rosser | |
| Greg Dickson | Larry J. Sartin | |

32. The property destroyed was all the property these men possessed. Many of the items had been purchased from the prison commissary. The property DOC intentionally allowed its employees or agents to dispose of included items such as:

a. Clothing (i.e. t-shirts, socks, boxers, gym shorts, sweat shirts, sweat pants, hooded sweat shirts, and jackets);

b. Shoes (i.e. various brands of shower shoes, various brands of running sneakers, and various brands of everyday sneakers);

c. Toiletries and other hygiene products (i.e. soap, baby powder, toilet paper, toothbrushes, toothpaste, shampoos, body washes, deodorants, cotton swabs, and toenail clippers);

d. KOP medications which include but were not limited to cortisone creams, antifungal crams, ear solutions, and ear wax removals;

e. Eating utensils (i.e. bowls, plates, coffee cups, drinking cups with lids; standard drinking cups, and sporks);

f. Commissary foods which include but were not limited to: coffee, crackers, oatmeal's, soups, cookies, candy, and sodas;

g. Religious items including but not limited to Bibles, Islamic prayer rugs, scriptures, Missals, Quran, religious photos, and religious study books;

h. Electronics (i.e. radios, televisions, remotes, headphones, coax cables, extension cords, and fans);

i. Personal documents (i.e. family photos, stamps, notepads, journals, envelopes, drawings, certifications of completion, school work, and various other correspondence from family and friends);

j. Legal documents: folder w/ deed & land survey, legal work, legal transcripts, legal mail, sentencing orders.

33. After February 2, 2017 DOC CERT and C/O's continued to abuse and torture the men who had been inmate hostages at JTVCC building C-19, but also began to torture and abuse other inmates who were not in building C-19. This often took place during group shakedowns of the men's cells. A shakedown is usually a C/O searching a man's cell for contraband, and often involved a strip search of the man as well. A single cell can be searched by one C/O searching and another watching the inmates who would be removed from the cell prior to it being searched. However, after February 2, 2017, CERT would come with a large number of officers, usually wearing masks and equipped with riot gear, and shakedown whole tiers of men.

34. There is no comprehensive list of contraband, so each individual C/O decides what classifies contraband, consequently, items not considered contraband by one C/O are by another. Even items given to the men by DOC or with DOC permission are confiscated as contraband. C/O's often deem certain items contraband as retaliation for an inmate's complaints. Invariably the shakedowns end with the men's property strewn around the cell, often mixed with that of the cellmate, and often damaged or broken. The inmates subject to the CERT tier searches report

that their property was always damaged, destroyed, or missing after the CERT shakedowns.

35. DOC policy 8.36 regarding inmate personal property states in part:

> " It is the policy of the Department of Corrections to allow offenders to retain in their possession a reasonable amount of personal property. Offender personal property items shall be controlled to ensure the safety and security requirements of an institution are maintained.
>
> "Each offender shall:
>
> b. Be provided with a written, itemized receipt for all personal property retained in storage, confiscated and/or disposed of. A finalize copy of the listing shall be retained on filed as firected by the Warden."

Inmates who were in C building who did not have their property retunred to them also were not given an itemized receipt for all their personal property stored, confiscated or disposed of by DOC employees or agents.

36. Men tortured during shakedowns between February 3, 2017- February 7, 2017 include the names listed below and many others not named here:

| | |
|---|---|
| Aaron K. Carter | Darrin L. Swiggett |
| Andre A. Rivera | Gerard E. Szubielski |
| Nigel C. Skyes | Orin L. Turner |

a. "I was beaten by CERT on 2/4/17 and they took my knee brace that had been prescribed for me by

medical and without it I could not walk without significant pain."

37. Men tortured during a shakedown on February 13, 2017 include those listed below and many others not named here:

| | |
|---|---|
| Alan Brooks | James Durham |
| Steven Drake | Rayond Sawyer |
| Fenel D. Baine | Michael E. Keyser |

a. "The water was turned off around 9am and men in the tier could not flush the toilet or wash their hands from 9am to 7pm.

"I was handcuffed and after protesting was pushed to the ground. The handcuffs were so tight that when they were removed, they had left marks and my hands were blue. CERT shoved my forehead into the wall and I was forced to sit on my knees for over 90 minutes.

"I was informed by other inmates that in order to get treatment for injuries sustained during the revolt, they had to lie and give a different reason for the injuries. On February 27, I sent a letter to Warden Radcliffe with my complaints about treatment."

b. "CERT, only allowed me to put on a T-shirt, gym shorts and shower shoes after I was strip searched. In my cell and over at the chow hall where they took me, I asked to urinate. They said they were going to allow me to do it, they never did, and ultimately while standing facing the wall I urinated on myself. C/O's made fun of me about it when taking me back to my cell. One of the C/O's continued to purposely step on my toes, eventually severely injuring one of them. I could not put weight on it and it began to become discolored. Despite numerous requests I was not seen for my injuries until the 29th. Once I was brought to sick call and one of the nurses complained about me not coming at the right time and refused to see me. While I sat there waiting to be taken back to my cell, the nurses played cards. For about a month the water for the shower was scalding hot and could not be adjusted, just turned on and off."

38. Men tortured during a shakedown on February 14, 2017 include those listed below, and many others not named here:

| | |
|---|---|
| Dymere T. Berry | David D. Foreman |
| Alonzo I. Cannon | Regent J. Goddard |
| Chris E. Craig | Keenan Wheeler |
| Maurice Cruz- Webster | Raymond H. Wood |
| Krishan Dillard | |

a. "There was a mass assault on MHU bldg. CERT used riot gear shock shields. C/O Eric Lehman use pepper spray under the door without warning. CERT kicked and stomped on men with their boots and hit them with nightsticks. No resistance by the men, full compliance. Full compliance with orders. Two of the men were beaten severely while handcuffed. C/O Lyle Neil C/O K. Neil C/O J. Connor C/O S. Milligan ~~C/O~~ and C/O L. Coverdale, ~~C/O~~ participated in the beating or did nothing to stop it. The beaten men had large cuts and bruises all over their bodies. The men were told to send grievances to staff Lt. Reynolds, which they did, but got no response."

b. “CERT sprayed pepper spray under my door even though I was not resisting. Participating were, C/O's J. Kuhner, S. Milligan, D. Rains, J. Connor, K. Neal, L. Coverdale. They tazed, beat, punched, kicked, and kneed me. They drug me out of the cell and down the stairs and forced me onto my chest and told me to keep my face and chin on the floor. I was then dragged to building 23 and made to sit at a table with forehead pressed against the table. They then dragged me from 23 to 18 because I was charged with a disciplinary violation. I ended up in solitary with just a mattress on the floor until March 1st, I never got proper care for my injuries.”

c. “A storm of guards in full riot gear stormed the tier and took us out of the cells and beat us. I was beaten, and ribs cracked, kicked in private parts. Gas was squirted up my nose and in my mouth. I have no taste at all. I couldn’t breathe and told them I can’t breathe! They said “F**k you,” and I told them “I have mental health issues and I

shouldn’t be in this pod. I was scheduled to be moved.” They said “F**k your mental health.” I was brushed burned everywhere from being drug around nude (clothes ripped off of me and tossed to the side) and my arms were chicken winged, I thought they were going to kill me. While they were dragging me, one said “this is like dragging a dead deer!” They said “M****r F*****s will learn who is in charge tonight!” I had no shoes, no medical help and some of us have broken noses and deep cuts and no medical help at all. Rainey – Kuhner – Dunlap – Eric Lehman – Milligan and Coverdale seemed to be in charge. These are the ones who came in my cell and beat me. Coverdale is the one I think put tear gas in my nose and mouth.”

d. “More than 20 employees in full riot gear stormed onto the tier where I was being held, yelling threats, obscenities, homophobic slurs and racial epithets. They approached each cell door

and sprayed Capstun (Pepper spray) into each cell and then began physically attacking the inmates. Inmates were yelling that they were not doing anything, and the officers were laughing at them, calling him names, telling them “It’s payback time” and “you thought this was over” etc. All of the inmates were strip-searched and after their clothing was returned, they were cuffed behind their back and the officers yanked their arms up past their shoulders and forced them out of the building while shoving their necks down and yelling “look at the f*****g ground… Don’t f*****g look up at us”.

They were ordered to kneel with their legs crossed and hands cuffed behind their backs for nearly 2 1/2 hours. When they returned to their cells they found their personal property had been thrown all around and some of it had been destroyed. I filed sick calls and received no response.”

39. Men tortured during a shakedown on February 15, 2017 include those listed below, and many others not named here:

| | |
|---|---|
| Fred T. Caldwell | Shaquille K. Jackson |
| Joseph Crumpler | John C. Mayhew |

a. "I was in building 23 tier D and everyone there obeyed the orders of CERT to stand at the back of their cells with their hands on their heads. Nevertheless, CERT sprayed pepper spray under the door, entered the cell and tazed me with the shock shield. They slammed me, kicked me, stomped on me, slapped me, and pinched me. They verbally abused us as well. They slammed me into the corners of doorways and pushed my face against the walls when taking us to the dining hall. I was put in isolation for 15 days and denied medical attention for weeks. When we go to sick call for injuries caused by CERT, we have to pay for it, even when it was CERT that caused the injuries."

40. Men tortured during a shakedown on February 27, 2017 include those listed below, and many others not named here:

| | |
|---|---|
| Jarad Brown | Tony Mozick |

| | |
|---|---|
| Charles T. Getz | ~~Anthony J. Ortiz~~ |
| Alfred M. Lewis, Jr. | Christopher Porter |
| Kevin McCray | Sylvester C. Shockley |
| David McCullough | David R. Smith |
| John E. Miller | |

a. "CERT members wearing black masks, uniforms, and no name tags suddenly entered W Building (a minimum-security unit). They beat inmates without provocation, and pressed riot batons against inmates' anal and genital areas. They ordered inmates to put their contaminated hands, or items that had been in their anus, into their mouths."

b. "I was pepper sprayed, snatched off the top bunk, punched, dragged in the hallway, kicked repeatedly by (6) six correctional officers, handcuffed (hands behind his body), kicked and beat again while my hands were handcuffed. As I was being escorted off the tier, I was led to the top of the stairs (which is made of concrete and steel) and thrown head first. I hit all 10 steps before landing at the foot of stairs on my head. I was lying in a pool of my own blood, unconscious. I received no medical attention

or checked for vital signs.  But was hoisted up and dragged out of the building by (2) two officers. These 2 officers dragged him between the buildings of T-2 and T-3, where they continued to beat, punch and kick my teeth out."

"After continuous kicks and punches to my face and body, I was still handcuffed with my hands behind my back, the officers finish with a high-five and a fist pump. I was taken to the infirmary where I received little or no medical attention. Taken to the SHU (Security Housing Unit) where I was unable to receive any medical attention. I have fractures to my skull, face, ribs and I'm suffering from a broken collar bone, as well as a loss of teeth. I was not in C-Building during the hostage situation, nor was I being combative, resisting or verbally abusing these officers.  I was laying in my bunk, when unknown to him, my cellmate had opened up the door as the CERT team (Correctional Emergency Response Team) was

leaving the tier. My cellmate asked the team a question and was beaten. As they sprayed him and beat him, they continued into the room and proceeded to snatch me off my top bunk and pepper sprayed and beat me also."

c. "Cert pushed me down the stairs. I grieved it, but it was returned unprocessed, as is every other grievance about inmate abuse. During shakedowns CERT always breaks the hooks off the wall that we have purchased from the commissary."

d. "A CERT member inserted a pen into my anus while I was bent over for the strip search, it dropped to the floor and he made me pick it up and put it in my mouth and use it to lift up my tongue. He also hit me on the testicle because one of them had been operated on not long before and was swollen. CERT destroyed my property including my TV. I made many efforts to try to make them to pay for it. I ended up being disciplined for trying to get reimbursement for my property. Lt. Tyson

kept telling me not to pursue justice. Sgt. Arabian uses vulgar language when yelling at inmates, conducted improper shakedowns, falsified reports, and kept our building or tier on lockdown for no apparent reason. Lt. Drace did the same, including locking down the building when he conducted his own personal business. Lt. Drace would go out of his way to aggravate and verbally abuse inmates. Some inmates thought that he had been responsible for the deaths of several inmates. They also know that he was suspended for some period of time, although it has not really changed his behavior.

e. "CERT came to building W, H- tier, shouted at the inmates to stand at their windows, backs to the door with our hands on our heads. I heard shouts of "payback time". I heard the sound of inmates being shocked with the electric shield. When they came to my cell they told me to face them strip lift my genitals turn around spread my ass cheeks, squat, cough, stand up, turn around facing them put my

finger in my mouth and pull my cheeks away from my teeth and lift my tongue. Then they sexually assaulted me by penetrating me with a wooden stick. Then they forced it into my mouth. My arms were then pulled up behind my back and I was taken down the steps and slammed to the ground on my naked buttocks and an officer dragged me by my leg for a few feet. They dragged me to my feet by my arms and forced my head down and pulled my arms up behind me and walked me into a chow hall where I was placed up against the wall facing it. The same officer was with me the whole time including the assault. It was C/O Jack Evans. I tried the PREA hotline without much success and reported the abuse to every high-ranking officer I could think to notify including Warden Radcliffe. Eventually Lt. Tyson yelled at me because I wrote letters to Unit Commander, Security Superintendent, and Warden. I was interviewed by Lt. Satterfield. To my

knowledge, DOC has done nothing about my assault."

f. "It was a shakedown at gunpoint. I had to stand facing the wall even though there were tables and stools in the room. It was very cold and the doors to the cafeteria were kept open even though the inmates were not dressed for cold weather. I was thrown to the ground and suffered injuries including a broken finger. I saw puddles of blood outside on the sidewalk in front of the entrance to W building. Inmates continued to be pepper sprayed and beaten that entire day and into the night. Sick calls are answered in weeks, grievances in months.

41. Men tortured during a shakedown on March 9, 2017 include the following and many other not named here:

| | |
|---|---|
| Nathaniel Bagwell | Monir A. George |
| Marquis Boyer- Smith | Victor Grantham |
| Justin L. Burrell | Theodore Harris |
| ~~Luis G. Cabrera~~ | |
| Keith J. Miller | |
| Ivan Carabello | Lamont Norman |
| Christopher Porter | Lionel M. Walley |
| Millard E. Price | Michel L. Wells |
| Russell E. Steedley | Eugene W. Wiggins |
| Henry R. Taylor, Jr. | |

a. "50 to 100 of correctional officers suddenly entered housing unit 19-AU 2. Inmates were ordered to stand and face the window away from officers, with their ~~hands on~~ hands on top of their heads. Three or four officers entered each cell and told the occupant(s) to back up to the sound of their voices. Inmates were forced to strip naked (often in the presence of a female officer or officers), bend over, and spread their butt cheeks apart. The officers ordered the inmates to lift their genitals, move a finger around in their mouth, and put on a shirt, pants, and shower shoes. Inmates were then bent over at the waist with their hands restrained and ordered to stay in that position, or else they would be assaulted. Inmates were pushed downward with their hands lifted behind their backs, forced to walk outside in freezing temperatures to the cold weather with little clothing, and forced to sit cross-legged on the ground, facing a wall, for roughly three hours.

Many inmates had sustained injuries, which made the sitting especially painful, and some almost lost consciousness during this ordeal. Some officers shot pepper balls from ~~paint~~ pepper ball guns at the seated inmates. About 1:15 A. M., inmates were forced to walked back inside, again bent over facing the ground. Upon returning to their cells, inmates noticed that officers had ransacked their cells, commingled personal property of different inmates, and damaged their fans and televisions."

b. "On March 9th CERT made me strip, grab my privates, spread my butt cheeks, put fingers in my mouth. I was handcuffed forcefully bent over, taken to C tier yard, arms jacked up behind my back until I thought they would break. They made me cross my legs and face the wall, and they pushed my head down until my face touched the ground. My grievance was not processed. We have no schooling or drug rehab. The staff reads all our grievances, and if you grieve them, they retaliate."

c. “During the 3/9/17 shakedown C/O Kirk Neil punched me in the face and C/O Milligan or C/O Rutkowski sprayed Capstun into my mouth.”

d. “Warden Radcliffe led a large contingent of CERT members dressed in black with masks carrying clubs and shields. They gave us profanity laced orders, and the incident last about two hours during which we were constantly threatened with serious bodily harm if we didn't obey orders. At least one female was present when we were told to strip After I filed a grievance I was told that any complaints about CERT should be sent to Warden Radcliff.”

e. “I was sexually abused by CERT on March 9.”

42. Stephen Hampton letter to Governor John Carney on March 20, 2017, asking for action to end the abuse of inmates at JTVCC. It didn’t. *Exhibit attached.*

43. Danielle Gibbs, the Chief Legal Counsel for Governor Carney, responded for the Governor on March 30 and in her letter wrote:

> “As you may be aware, the Delaware Department of Correction is “completely responsible for the maintenance, supervision and administration of adult detention and correctional services and facilities of the

> State..."29 *Del. C*. section 6502." Accordingly, your letter and attachments have been referred to the Department of Correction, and to its legal counsel within the Department of Justice." *Exhibit attached.*

44. Mr. Hampton's immediate email response included the following:

> "Sending copies of my letter to the Department of Correction (DOC) and the deputy attorney general (DAG) assigned to DOC, was futile if the goal was to end the abuse. DOC has been fully aware of the complaints of abuse for well over a month and has not ended it. The DOC DAG has no authority over DOC and is tasked with defending DOC against the claims made by abused inmates. If as it appears, the Governor has no remedy available to end torture in Delaware prisons other than to forward the complaints to DOC, it can rightly be said that there is no State Department or Agency that will protect Delaware inmates from being tortured in Delaware prisons." *Exhibit attached hereto.*

45. Men tortured during a shakedown on April 12, 2017 include the following and many others not named here:

Nathaniel Bagwell Claude LaComb

a. "About 50 CERT officers performed another "shakedown" in 23 A and D Tier. They ordered inmates to strip naked in front of several officers and cell mates, then they handcuffed inmates and forced them outside in bare feet. Inmates were forced to sit on the

pavement with their legs crossed and heads down for 1.5-2 hours."

b. "About 50 officers took all of us out of 23- D, with our hands cuffed behind our backs, into the yard. We were forced to sit handcuffed on the ground for hours while officers with guns stood behind us, laughed, and enjoyed themselves. No inmates acted up to deserve this treatment. Torture inflicted on us twice in 32 days during March and April. Yard cameras should show the incident. The hours spent outside on the ground caused us injury, but we did not get medical treatment for our injuries. C/O's regularly make racist remarks toward inmates and constantly tell us how much they don't care about our wellbeing. Sgt. Payton has a reputation for being a "tough guy" and abusing inmates. Facility is in "chaos" as C/O's do whatever they want. Defendants should include: Sgt. Aaron Forkum, Sgt. Nathaniel Payton, C/O Joshua Stewart."

c. "4/12/2017- (19:00) Quick Response Team with about 50 officers performed a shakedown in 23 A Tier. We were ordered to strip naked in front of 5-6 officers and cell mates, handcuffed and brought outside barefoot. We were forced to sit on the pavement with our legs crossed and heads down for 1.5-2 hours. Officers ordered us not to look at any staff. Upon return to my cell I found that all of my personal and legal documents/books were on the ground with water spilled on them. Many irreplaceable materials were ruined.

d. "Sgt. Mock and Lt. Savage threatened me for fighting previous write-ups saying, "I can injure you now and get away with it". All the guards are ready to attack inmates, "just look at me wrong" they say.

e. "We had all property taken from us or destroyed, with the exception of our clothes."

f. "Staff enforces different rules. Sometimes we are allowed to talk at the chow hall, or pass and receive

items, and sometimes we're not. Inconsistent rules confuse inmates."

g. "No educational or rehabilitation programs offered. When they did exist, they were limited, and the waitlist was 6 months to 1 year."

h. "Only thing that seems to matter to the C/O's is that inmates don't act up and they have to stop playing on the computer."

i. "Any C/O can take your property or deny phone calls if they want."

j. "Rules change along with changes of on-duty C/O's."

k. "Rules mean nothing, because they all back each other up even if it involves lying."

l. "The grievance procedure is a waste of time, always a denial and officers never receive actual discipline from grievances anyway.

m. "Disciplinary reviews always find inmate guilty no matter what, "It's a hopeless fight."

n. “Causes of revolt: basic disrespect by officers who know they won’t be disciplined. Hopelessness in classification system wherein inmate could stay out of trouble for 3 years and still be denied more freedom or less security. Overcrowding causes inmates to be severely disciplined for minor infractions because there’s no space to house inmates on compound.”

46. Men tortured during a shakedown after February 2, 2017 who are not included in the paragraphs above:

| | |
|---|---|
| Robert L. Adger | Tyrone Mathis |
| Samuel B. Bishop | Ezra S. Pendleton |
| Michael A. Brown | Hassan J. Perry |
| Robert W. Chandler | Marcus Rosser |
| Donald Cole | Ben Roten |
| Brian Conley | Larry J. Sartin |
| Krishan Dillard | Daniel E. Schultz |
| John R. Dupree | Joseph Wallace |
| Victor Grantham | James G. Wells |
| Antoine Jones | Christopher H. West |
| Claude LaComb | Eubanks White |
| James Lawhorn | Ronaldo Williams |
| Andrew D. Long | Robert L. Worley |
| Dana B. Martin | |

a. “I asked for one-on-one mental health counseling after the events of February 2nd, but none

provided as of March 12. I was told they will give me "mental health literature "if interested."

b. "C/O McCarthy told an inmate "You guys that are coming from C-Building will not see a nurse or doctor until y'all injuries heal up a little bit."

## AFTERMATH

47. DOC has shown very little interest in addressing the institutional problems at JTVCC and other Delaware prisons.

48. None of the defendants intend to change their ways or hold anyone accountable for the torture JTVCC inmates suffered on February 2, 2017 or since then. There has been no investigation of the widespread criminal actions of correctional officers at JTVCC despite the overwhelming evidence of criminal action by a substantial number of correctional officers, most of whom are still working at JTVCC and have received little if any disciplinary action. The entire episode should have been investigated by an outside law enforcement agency, and it is a disgrace to the state of Delaware that that did not happen. Instead DOC and Connections have done what they can to suppress the truth about the criminal activities of many of the defendants.

49. In the 24 months since February 2, 2017 the physical and verbal abuse of incarcerated men in DOC facilities still occurs on a regular basis. Commissioner Phelps and Governor Carney have not taken steps to curtail the violence or call for an unbiased investigation of the inmates' charges of torture and ongoing abuse, nor have they disciplined any C/O's involved in the illegal and unconstitutional violence against inmates. The C/O's who did not retire or quit after February 2nd are confident there will be no discipline or consequences to their jobs for abusing inmates, therefore many have taken to abusing and terrorizing inmates they come in contact with even if they were not in C building. The worst offenders are the regular CERT members. All complaints about abuse by CERT members go to CERT Warden Radcliffe, who has on occasion joined with them during abusive shakedowns, and who is obviously not going to discipline any of them for abusing inmates. In fact, he does not even bother to respond to the written complaints sent to him by the men tortured under his watch.

50. The medical care is getting worse and worse in DOC prisons. At JTVCC men with serious illnesses or injuries are going long periods of time without any treatment or even an evaluation. Often their condition worsens significantly while they are waiting to be seen by the medical department which makes them see a nurse for two sick calls before they can see a doctor. Connections, the DOC medical provider remains woefully understaffed and fails

on a regular basis to provide inmates with basic medical care in a timely manner. Connections has ties with state, government and its contract to provide medical and mental health services to DOC was renewed this past July, without the State taking any other bids on the contract.

51. DOC set up a grievance system for inmates to file medical but filing them is often all that happens. Occasionally an inmate's medical grievance well be appealed up to the Bureau Chief level and will be approved at that level. Despite having their grievance approved, the inmates still don't get the treatment that was the basis for the agreements. Connections seems to just ignore the fact that the grievance was approved.

52. Other grievances cannot include grievances about behavior of correctional officers, which is the main problem other than medical issues facing most inmates. Inmates with complaints about the behavior of a correctional officer are told to write to the warden in charge of the correctional officer. Therefore, when inmates were tortured by CERT, they were told to file their complaints and grievances with Warden Radcliffe, the warden of CERT who on occasion was with CERT during their shakedown of a tier of inmates. Some inmates have filed complaints and grievances with Warden Radcliffe, not surprisingly they were not answered.

53. The disciplinary rules and procedures are still based on which C/O is on duty. Beatings from correctional officers are still quite common, and invariably they're accompanied with false incident and disciplinary reports to justify them. The inmate ends up being beaten for no legitimate reason, and then is disciplined because of the incident which was solely provoked by the correctional officer.

54. C/O's continue to mistreat inmates at JTVCC. ~~ON~~ On March 31, 2018 about fifty inmates in B/Annex at James T. Vaughn Correctional Center were strip-searched and forced to spread their butt cheeks with cameras aimed at their anal regions by order of watch commander James P. Satterfield. When several inmates complained to the C/O's, the C/O's threatened to send them to "the hole," meaning solitary confinement. When the prisoners contacted the "Prison Rape Elimination Act" hotline, they spoke to a rude, condescending and insulting female officer.

55. Dwayne Cropper was 54 years old, stood 5'3'' and weighed a little over 150 lbs. when on August 15, 2018 a Quick Response Team, for reasons not listed in his medical records set upon Mr. Cropper at JTVCC torturing hism so badly that the medical staff called for an ambulance and paramedic to take to Kent General Hospital Emergency Room.

The first nurse practitioner who saw Mr. Cropper noted a hematoma and laceration under his right eye and a laceration on his right elbow. He was

complaining of his chest burning and difficulty breathing and had several episodes of vomiting. He stopped responding to her questions, so she had him smell ammonia salts to revive him. She noted he was unable to stand without assistance, had decreased lung sounds and weakness, had a history of seizures, and apparently had a head injury. When a different APRN, CNP saw Mr. Cropper, he was crouched on the mattress on the floor, head down, legs straight out and he was shaking. He was complaining of horrible burning pain in his right eye where he had been shot with a pepper ball gun. He had abrasions to both hands and his left lower extremity, and a long abrasion to the left flank. She observed that his chest/abdomen/back were bright red and there were darker red 1 cm in diameter marks on his right and left shoulders, chest, abdomen, and left lower extremity. (Marks consistent with being shot by pepper balls at close range).

The APRN was unable to examine his eyes due to the significant swelling, and recommended he go to the ER for further evaluation. We know from the DOC records that the next day Mr. Cropper was admitted to Wills Eye Hospital because he had a "ruptured globe to the right eye" and needed a surgical procedure. He did not return to JTVCC until 8/17/18. Despite multiple visits to Wills Eye Hospital, Mr. Cropper's vision remains very blurry and it is probably unlikely that he will ever regain vision like he had before correctional officers shot his eye out with a pepper ball gun.

A pepper ball gun manual available online, as might be expected, cautions that the gun should never be pointed at somebody's eye. The use of the pepper ball gun on Mr. Cropper was no doubt unjustified. He is a small older man and QRT's consist of 5 large C/O's dressed in riot gear. The only reason the C/O's brought out the pepper ball gun was to play with it and torture Mr. Cropper. I would like to think that someone in Delaware government believes that torturing inmates for the fun of it, is not acceptable in Delaware. So far I have not heard of any disciplinary action taken against the C/O's who abused Mr. Cropper.

56. There have been regular shakedowns of all inmates who might be called as witnesses at HRYCI, including a shakedown on October 31, 2018. It began with all men on the "potential witness" tier being strip-searched and verbally humiliated in front of the cameras on the tier. Then while handcuffed, they were taken outside in 50° weather with minimal clothing and made to stand in the yard with their faces on the wall. They were intimidated by K-9 dogs while in the yard and all were escorted to "medical" and forced to undergo an x-ray of their abdomen against their will. The radiology tech told one of the inmates that she had been instructed not to put the lead apron on inmates when she was x-raying them. There could not have been any reasonable suspicion that all of these men who had been incarcerated for substantial amounts of time were concealing anything in their

bodies that could be seen only on x-ray. Furthermore, DOC's search policy under 8.32 states in part:

> d. "Searches for Ingested or Contraband
>
> 2. If there is a reasonable suspicion that an offender has ingested drugs of other contraband, the offender will be separately housed in a dry cell…
> 3. Offender will be held for a period of time to allow passage of the drugs/ contraband out of the body by natural functions"..

Several hours after being taken to the yard, inmates were returned to their cells to find that they had been completely torn apart and their property strewn about the cell by the by C/O's. Inmate Brathwaite was one of these men and for no reason other than for additional bullying and harassment, some C/O's insisted on strip searching him again before putting him back in his cell. They all mocked, ridiculed and harassed Brathwaite during the search. Even if there was a legitimate reason for these searches, they were taken to unwarranted extremes and used as excuses to retaliate against and punish Brathwaite and the others, which not only violates DOC's strip search policy, but constitutes cruel and unusual punishment. Outside the prison much of this behavior would be considered criminal, but inside, it has become standard procedure.

57. A similar shakedown took place on 11/07/18 at JTVCC Victor building after JTVCC went on a strict lockdown. The water was shut off around 10 a.m. and Nurses told inmates needing water to swallow medications, to refuse them

until it was turned back on. 12-15 C/O's, (including C/O's Estrada and Lance Green who are defendants in the inmates' civil lawsuit) came into Victor building fully armed and accompanied by K-9 dogs to threaten the men as they were pulled from their cells and strip searched. The C/O's made lewd and insulting comments to the men during the strip searches, while other C/O's took or broke the men's belongings in their cells.

58. Inmates (usually hostages) continue to be moved to maximum security units without new write-ups or charges. These moves are to intimidate and retaliate against these inmates.

59. The inmates at HRYCI and JTVCC who are potential witnesses in the criminal trials, arising from the death of Sgt. Floyd, have been singled out for exceptionally harsh treatment, no doubt as retaliation for the revolt and their civil lawsuit against some C/O's. Many of these men were transferred to Pennsylvania prisons in 2017 and returned to Delaware before the criminal trials began to be housed in maximum security. Men at HRYCI have reported having no recreation, no showers, no personal hygiene products, and actually no basic necessities because C/O's are refusing to give them any. They claim that their food has been cold, expired (milk/ juice), baby portions, and smells like cleaning supplies. Some potential witnesses who remained in Delaware and were at HRYCI for the last 3 or 4 months have lost as much as 20 pounds because of the miniscule food portions.

Withholding food as retaliation and serving only cold, nutritionally inadequate meals violates DOC policy 14.13 that states in part:

> "POLICY: To provide meals to offenders that meet the recommended dietary allowances, as established by the National Academy of Sciences. Plan menus in accordance utilizing the MPC to ensure all meals take into consideration food flavor, texture, temperature, appearance, and palatability. Regimentation of meal service will be minimized.
>
> C. At least three meals will be provided (including two hot meals) during each 24-hour period with no more than 14 hours between the evening and breakfast meals.
>
> G. Food shall not be withheld or used as a disciplinary sanction under any circumstance.

60. Commissioner Phelps and Governor Carney also know or certainly should know that people are dying and suffering horribly in DOC prisons because of the lack of healthcare and the indifference of the correctional and medical staffs. There are many inmates with serious medical conditions who are not receiving care for their conditions. Many DOC and Connections employees act indifferently to their suffering and need for treatment. That indifference was on display when 37-year-old Tiffany Reeves lay dead in her cell at SCI for 6 or more hours without anyone checking on her on 10/8/18. Ms. Reeves was on a "12-hour intoxication holds", since she had been found to be intoxicated. C/O's who work in the receiving area at SCI know that a substantial majority of these women are under the influence of or withdrawing from drugs or alcohol. Women who are intoxicated

or withdrawing from a substance should be monitored on a regular basis, but Ms. Reeves was not being monitored at all despite being on intoxication hold.

61. One month later, on 11/8/18, Luis Cabrera, 49, died of a perforated ulcer at HRYCI after being denied medical treatment for weeks of chest and abdominal pain. Luis's cellmate remembers that Luis became sick on 10/17/18 with coughing, vomiting, and a fever. Luis put in a sick call slip and a grievance, but it took roughly 10 days before he was seen by the nurse. Luis was prescribed medication. however, Luis was not given the medication prescribed for him nor seen again for his ongoing chest and abdominal pain.

On Tuesday 11/6/18 at about 10:30 pm, Luis was cleaning the tier when he grabbed his stomach and cried out in pain, falling to his hands and knees moaning. After some delay, C/O's with a K-9 dog arrived and cuffed Luis, and then stood watching him until Sgt. Thomas arrived and instructed a C/O to call a medical emergency. Eventually the medical team arrived and took Luis to the infirmary, however a medical supervisor refused to call 911 for Luis, because she said he was faking his symptoms. So, he was left untreated until he died a horribly painful death on the floor of the infirmary.

According to the coroner, Luis had a perforated bulge in his intestine, and his death certificate confirms that he died from a perforated ulcer. His condition was treatable, and prompt medical care would have saved his life.

A perforation happens over time, as stomach acid eats away at the intestinal lining until the ulcer perforates through the intestine, causing the contents of the intestinal track to spill into the abdominal cavity. Peritonitis, an infection of the lining of the abdominal cavity follows, and untreated peritonitis results in sepsis, which untreated, is fatal. Even after perforation occurs, prompt surgical treatment can usually save the patient, but neither Connections or DOC employees did anything to help Luis, even after he was so ill he could no longer stand. Luis weighed approximately 130 pounds when he originally was housed on the tier, but subsequently had lost about 20 pounds before his death due his illness and to poor food.

62. Warden Pierce did very little to address the problems that led to the revolt. Warden Metzger has done a little more but knows about all of the things done to inmates since February 2, 2017 and has done nothing to stop the ongoing abuse and mistreatment of inmates at JTVCC. Many of the most violent officers who participated in torturing inmates on and after February 2nd, are still at JTVCC and have not been punished for the criminal behavior in the past, nor are they being disciplined for the ongoing abuse of the inmates at JTVCC. Some things are clearly

worse such as the healthcare debacle that seems to worsen every month. There is no evidence that Warden Metzger has done anything but ratify the past treatment of inmates at JTVCC and acquiesce to the ongoing mistreatment of those inmates.

63. <u>In a recent *delawareonline* article DOC Commissioner Phelps is quoted as saying "… the Delaware prison system is completing its mission to protect public safety and rehabilitate offenders." DOC's mission according to DOC policy 1.1--IV is actually "…to protect the public by supervising adult offenders through safe and humane services, programs and facilities." It is difficult to comprehend why anyone would believe that DOC is fulfilling its mission as there clearly are no "safe and human services, programs and facilities" in any of the DOC prisons.</u>

64. DOC and JTVCC preside over a bureaucracy that punishes inmates all of the time by being cavalier about their prison records. Inmates do not get credit for good time when they should, do not have their sentences interpreted correctly, and for no good reason other than bureaucratic incompetency many spend days weeks or months past their release date waiting for DOC to finally correct this mistake and send their prison a release order. This mess is not new and has not been the concern of any DOC management or other state agency, all of whom have taken a very cavalier attitude toward making people remain in prison past their release date because DOC bureaucracy is horribly incompetent.

65. DOC facilities need to be fully staffed and equipped, but more important, they need to be staffed with individuals who will act professionally in all situations. The current physical and mental abuse and degradation of inmates at JTVCC cannot be defended as legal, let alone professional. It must stop now, otherwise there is no way forward at JTVCC that doesn't end in disaster.

66. Defendants Commissioner Perry Phelps, Warden Dana Metzger, Warden David Pierce, Warden Robert May, Deputy Warden Phil Parker, Deputy Warden James Scarborough, Former Commissioner Robert Coupe and Major Jeffrey Carruthers, knew that:

a. a culture of violence existed at JTVCC, and that C/O's frequently physically and verbally abused inmates without fear of being disciplined;

b. the cruel and unusual punishments clause of the Eighth Amendment, incorporated by virtue of the Fourteenth, obliges States to provide adequate medical care for inmates who have lost the means to provide for themselves, and prison officials such as them, are constitutionally bound to provide such inmates adequate physical and mental health care for any serious medical condition;

c. they had a duty to ensure that DOC, Connections, and employees of both complied with all laws, regulations and rules, as well as the United States Constitution, when providing medical care to inmates;

d. inmates at JTVCC were being denied timely care for their serious medical and mental health conditions by Connections and correctional staff, and that some inmates had serious conditions for which they were receiving no care;

e. the combined rescue team, consisting of DOC's CERT, other DOC correctional officers, and state troopers from Delaware and Maryland that was assembled to go into JTVCC, was going to abuse, mistreat, and torture the inmates in building C -19 after they had retaken the building. The only exception being the inmates who helped protect counselor May, for whom special orders were given not to beat them;

f. that living conditions for inmates at JTVCC, especially those inmates who had been in C-19, were extremely bad by design to punish and abuse the inmates from February 2, 2017 on, this included keeping these inmates in isolated maximum-security housing for extended periods of time without any justification;

g. that C/O’s were deciding what the rules of conduct would be for inmates each shift, so that the inmates had no way to avoid violating them, and that inmates were being punished for violating rules that changed every shift without their knowledge;

h. that there has been no investigation into the allegations of torture and abuse by DOC CERT, DOC C/O's, and state troopers working with and under the direction of Delaware prison authorities.

67. Defendants Commissioner Perry Phelps, Warden Dana Metzger, Warden David Pierce, Deputy Warden Phil Parker, Deputy Warden James Scarborough, and Major Jeffrey Carruthers knowingly breached their duty to:

a. make sure that the inmates at JTVCC received reasonable medical care for serious medical conditions;

b. protect the inmates from torture and abuse by C/O’s in JTVCC;

c. prevent C/O’s from denying inmates adequate food, bedding, toiletries and privileges to which the inmate should have been entitled, such as recreation time, phone calls, and visitations;

d. Investigate inmates’ complaints of abuse and torture at the hands of CERT and C/O's and discipline CERT members and C/O's as the facts warrant.

68. The intentional acts of these Defendants constituted:

a. Assault;

b. Battery;

c. Intentional infliction of emotional distress; and

d. a violation of plaintiffs’ constitutional civil rights pursuant to *42 U.S.C.* §1983 and their 8th Amendment right to be free of cruel and unusual punishment.

69. Defendant Timothy Radcliffe was aware of the torture and abuse of inmates by CERT as he is CERT warden and participated in some of their shakedowns at JTVCC. He has done nothing to investigate the complaints against CERT and isn't taking any disciplinary action against CERT members for abusing and torturing inmates. Furthermore, he is not bothering to respond to the letters of complaint he has received from inmates about the abuse by CERT.

70. The intentional acts of Defendant Timothy Radcliffe constituted:

a. Assault;

b. Battery;

c. Intentional infliction of emotional distress; and

d. A violation of plaintiff's constitutional civil rights pursuant to *42 U.S.C.* §1983 and their 8th Amendment right to be free of cruel and unusual punishment.

71. Defendants Commissioner Perry Phelps, Warden Dana Metzger, Warden David Pierce, Warden Robert May, Deputy Warden Phil Parker, Deputy Warden James Scarborough, former Commissioner Robert Coupe, Major Jeffrey Carruthers, Captain Bruce Burton, Lt. Justin Atherholt, Lt. Nathan D. Atherholt, Lt. Jason T. Coviello; Lt. George J. Gill; Lt. Melvin B. Harris, III; Lt. Karen Hawkins; Lt. Sean R. Milligan; Lt. James P. Satterfield; Lt. Larry Savage; Lt. Charles D. Sennett, Jr.; Sgt. Ronald Frederick; Sgt. Vincent E. Hazzard; Sgt.

Vincent May; Sgt. Kevin R. McKenna; Sgt. Robert Mock; Sgt. Charles H. Radcliffe; Sgt. Dennis P. Russell; Cpl. Nathaniel C. Payton; Cpl. Dale Lee Rains; C/O Michael J. Arabia; C/O Paul O. Barone; C/O Joshua A. Connor; C/O William Estrada; C/O Norman Figuera, Jr.; C/O Brett Foraker; C/O Lance N. Green; C/O Richard L. Griffith; C/O Michael Chester Landon, C/O Joshua Peppers; C/O Thomas Patrick Runyon, Jr.; C/O Joshua D. Stewart, C/O Abigail West, C/O Timothy R. Young, and C/O Aaron Forkum, have been involved personally, or been aware of and ratified the torture and abuse of inmates at JTVCC from February 2, 2017 on, including the following:

a. physical abuse of defenseless non-resisting inmates, such as beating, punching, jumping on, spitting on them, shocking them with an electric shield, spraying pepper spray into their mouth, eyes and nose, pushing them to the ground and dragging so as to cause injury;

b. verbal abuse of inmates, such as threats, obscenities and slurs directed to inmates based on their ethnic background or perceived sexual orientation;

c. unjustified seizing, disposing of, or destroying

inmates' personal property, often for retaliation or intimidation, and not for a legitimate penal purpose;

d. instigating arbitrary often retaliatory disciplinary actions against inmates, often as a cover for abuse of inmates by C/O's causing inmates to lose privileges and good time.

72. The intentional acts of these Defendants constituted;

a. Assault;

b. Battery;

c. Intentional infliction of emotional distress; and

d. a violation of plaintiff's constitutional civil rights pursuant to *42 U.S.C.* § 1983 and their 8th Amendment right to be free of cruel and unusual punishment.

73. Defendants Governor John Carney and Former Commissioner Robert Coupe, have been aware of and ratified the conditions that led up to the torture and abuse of inmates at JTVCC, and ratified the torture from February 2, 2017 on as described in the preceding paragraphs.

74. The intentional acts of these Defendants constituted:

a. Assault;

b. Battery;

c. Intentional infliction of emotional distress; and

d. a violation of plaintiffs' constitutional civil rights pursuant to *42 U.S.C.* §1983 and their 8th Amendment right to be free of cruel and unusual punishment.

75. Defendants Governor John Carney, Former Commissioner Robert Coupe, Commissioner Perry Phelps, Warden Dana Metzger, Warden David Pierce, and Warden Timothy Radcliff, were all aware that state troopers from Delaware and Maryland were going to be sent in to C-19 with Delaware's CERT and other C/O's, and that such troopers would engage in torturing and abusing inmates along with CERT and the other C/O's with no limitations other than not torturing the inmates who protected Counselor May. Consequently, they endorsed and ratified the actions of these troopers who were acting on behalf of them and DOC for whom these defendants have responsibility.

76. All of the Defendants have cooperated and conspired to allow the brutalization of the plaintiffs and others like them since long before the events of February 1, 2017 and are all jointly liable for the harm to the plaintiffs as described above.

**COUNT 1**
**24 USC 1983- CRUEL AND UNUSUAL PUNISHMENT**

77. The plaintiffs reallege paragraphs 1 through 63 above and incorporate them herein by reference.

78. All Defendants, directly or indirectly, have cooperated and participated with intentionally permitting the brutalization of the plaintiffs and others like them, since long before the events of February 1, 2017. They all knew that all inmates would be injured by the actions of the troopers, CERT, and C/O's involved in beating and terrorizing plaintiffs and other inmates similarly situated. But with deliberate indifference, nevertheless approved of the illegal corporal punishment that caused so much suffering of the plaintiffs who had nothing to do with the February 1, 2017 revolt. Therefore, they have all participated in violating plaintiffs right to be free from cruel and unusual punishment.

79. A class action on behalf of all inmates mistreated and abused at JTVCC is appropriate, and superior to other available methods for the fair and efficient adjudication of this controversy, because:

a. the class is so numerous that joinder of all members is impracticable. The defendants abused and mistreated hundreds of inmates at JTVCC on and after February 2, 2017. In fact, the abuse has not ended;

b. there are questions of law or fact common to the

class because the defendants engaged in a similar pattern of abuse and mistreatment of multiple inmates on multiple occasions;

c. the plaintiffs' claims are typical of the claims of other class members;

d. the plaintiffs will fairly and adequately protect the interests of the class;

e. the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the defendants;

f. adjudications of individual class members' claims would as a practical matter be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

g. the defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or

corresponding declaratory relief with respect to the class as a whole; and

h. the questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

**COUNT II**
**42 USC 1983—CONSPIRACY**

80. The plaintiffs reallege paragraphs 1 through 63 above and incorporate them herein by reference.

81. The defendants agreed among themselves to deprive the plaintiffs and other inmates similarly situated at JTVCC of their constitutional rights.

82. The defendants agreed among themselves to protect each other from liability for their deprivation of the constitutional rights of the plaintiffs and other inmates similarly situated at JVTCC.

83. In furtherance of the conspiracy, each defendant committed overt acts and was otherwise a willful participant in joint activity.

84. As direct and proximate results of the defendants' misconduct, the plaintiffs and other inmates similarly situated at JTVCC suffered physical and emotional pain and suffering.

## COUNT III
## IMPROPER CROSS-GENDER STRIP SEARCHES

85. The plaintiffs reallege paragraphs 1 through 63 above and incorporate them herein by reference.

86. The defendants conducted, or allowed their subordinates to conduct, cross-gender strip searches and cross-gender visual body cavity searches in the absence of exigent circumstances, in violation of *28 C. F. R*. § 115.15 and the Prison Rape Elimination Act, *42 U. S. C*. § 15607.

## COUNT IV
## INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

87. The plaintiffs reallege paragraphs 1 through 63 above and incorporate them herein by reference.

88. The defendant correctional officers, CERT members, and State Troopers, in the course and scope of their employment, engaged in extreme, outrageous conduct rooted in the abuse of power and authority, with the intent to cause the JTVCC inmates severe emotional distress or with reckless disregard of the high probability that the JTVCC inmates would suffer such distress.

89. As proximate results of those defendants' misconduct, the plaintiffs and other inmates similarly situated suffered severe emotional distress.

## COUNT V
## FAILURE TO PROPERLY TRAIN, MONITOR, SUPERVISE, OR DISCIPLINE

90. The plaintiffs reallege paragraphs 1 through 63 above and incorporate them herein by reference.

91. Defendants Metzger, Parker, Scarborough, McQueen, and other defendants in intermediate supervisory positions, failed to exercise due care in the training, supervision, investigation, and discipline of the other defendants who are their subordinates to prevent the abuse and misconduct alleged above.

92. Defendants Phelps, Coupe, Pierce, Metzger, Parker, Timothy Radcliff and Scarborough have received grievances and other complaints about the actions of their subordinates detailed above, but they have failed to discipline those subordinates, intervene to prevent further misconduct, or make it clear to the subordinates that such misconduct would not be tolerated in the future.

93. Defendants Phelps, Coupe, Pierce, Metzger, Parker, Timothy Radcliff and Scarborough, were aware of numerous pre-2017 instances of violence and/or excessive force by their subordinates, but they failed to discipline those

subordinates, intervene to prevent further misconduct, or make it clear to the subordinates that such misconduct will not be tolerated in the future.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court grant the following relief:

1. Grant a jury trial on all claims so triable;
2. Declare that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) and certifying the Named Plaintiffs as the proper representative of the class consisting of:
3. Declare that Defendants' acts alleged above violate the Eighth Amendment to the Constitution by torturing and mistreating plaintiffs as alleged herein;
4. Preliminarily and permanently enjoin the Defendants from pursuing the course of conduct complained of herein;
5. Preliminary and permanently enjoin the Defendants from pursuing settlement directly with any member of the putative over-detention Class described herein unless that person is represented by counsel;

6. Award all named plaintiffs compensatory, consequential, and punitive damages in an amount to be determined at trial;

7. Appoint an independent monitor to supervise JTVCC or DOC, and report to the court, to ensure that inmates are no longer being abused at JTVCC and that those who abused the inmates have been disciplined accordingly;

8. Award plaintiff's attorneys' fees and costs incurred in bringing this action under *42 U.S.C.* § 1988 or Federal Rule of Civil Procedure 23 ~~Delaware Superior Court Civil Rule 23~~ and grant such other relief as this Court deems just and proper.

WHEREFORE the plaintiffs, for themselves and other inmates similarly situated, respectfully request that this Court enter judgment in their favor and against the defendants, jointly and severally, for compensatory and punitive damages and injunctive relief from future recurrences of the defendants' abuse, misconduct, and misuse of authority.

GRADY & HAMPTON, LLC

/s/ Stephen A. Hampton
Stephen A. Hampton (Bar ID# 2451)
Anthony V. Panicola (Bar ID# 5787)
6 North Bradford Street
Dover, DE 19904
(302) 678-1265

Zachary A. George (Bar ID#5613)
225 South State Street
Dover, DE 19904
(302) 734-7401

James J. Woods, Jr. (Bar ID#2035)
745 Stratford Drive
Encinitas, CA 92024
(302) 893-7585
*Attorneys for Plaintiffs*

Dated: ~~October 31, 2018~~ February 4, 2019