**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ROBERT L. ADGER, II, et. at., | : | |
| | : | |
| Plaintiffs, | : | C. A. NO.: 1:18-cv-02048- LPS |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| FORMER COMMISIONER ROBERT COUPE, et. al. | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT UNDER CIVIL RULE 23 FOR A CLASS ACTION FOR DAMAGES AND INJUNCTIVE RELIEF**

1. At all times relevant to this action, the plaintiffs were inmates at the James T. Vaughn Correctional Center in Smyrna, Delaware ("JTVCC"), a high-security prison that the State of Delaware operates through its Department of Corrections (DOC) except for the time period in which some plaintiffs were moved to Howard R. Young Correctional Institution ("HRYCI") in Wilmington.

2. At all times relevant to this action, the individual defendants were acting under color of state law and in the course and scope of their employment with the State of Delaware. All defendants are being sued in their individual capacities for damages.

3. A class action on behalf of all inmates mistreated and abused at JTVCC is appropriate, and superior to other available methods for the fair and efficient adjudication of this controversy, because:

(A) The class is so numerous that joinder of all members is impracticable (the correctional officer ("CO") defendants have abused and mistreated hundreds of inmates at JTVCC);

(B) There are questions of law or fact common to the class, because the individual defendants repeated the same types of abuse and mistreated multiple inmates and on multiple occasions;

(C) The plaintiffs' claims are typical of the claims of other class members;

(D) The plaintiffs will fairly and adequately protect the interests of the class;

(E) The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the defendants;

(F) Adjudications of individual class members' claims would as a practical matter be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

(G) The defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; and

(H) The questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

## BACKGROUND

4. On February 1, 2017, about 10:20 AM, approximately five to seven inmates housed at JTVCC building C-19, seized control of the building and took hostages. The remaining inmates in C-19 did not incite, encourage, or otherwise participate in the revolt.

5. The factors leading to the revolt had been brewing for some time and were well known to all levels of the JTVCC supervisors and administrators. The mix of inmates and CO's in building C-19 had become increasingly volatile in the

preceding months leading up to February 2nd. The CO's assigned to building C-19 included some who were notorious for mistreating inmates and because of the disconnect between the rank and file officers and their supervisors, the inmates had to contend with inconsistent rules that changed at the whim of the commander for each shift. The C-19 population also included members of gangs who were antagonistic toward each other and should never have been housed together. Despite many complaints about abusive and inconsistent behavior of the CO's, and the warning from the CO's and some inmates including plaintiff Brathwaite, that something bad was going to happen at C-19, the JTVCC supervisors ignored the complaints of the inmates and belittled CO's who warned them. Security Superintendent Carruthers received but ignored emailed warnings from CO Floyd. CO's who reported the impending riot were ignored or told to get another job if they were too scared to work at JTVCC. JTVCC employee and hostage Theresa May later said, "It was common knowledge that the riot was going to come about… We just didn't know when."

6. As the hostage-taking inmates were seizing control of three correctional officers and a counselor, one or more of the officers called a Code 1, which means "officer down" and all CO's in the area are supposed to respond immediately to assist that officer. A number of inmates, including some who testified in the criminal trials stemming from the inmate revolt, observed inmates with their faces covered

attacking Sgt. Floyd and several other corrections officers. They observed the disguised inmates locking officer Floyd in a closet, but to their surprise they saw no officers responded to the Code 1until Lt. Sennett and other CO's walked into C-19. They saw Lt. Sennett walk back to the closet holding Floyd, and heard Floyd asking Sennett to get him out of there, but instead Lt. Sennett turned and fled the scene and told all the other officers to do that same. The inmate witnesses who saw Sennett turn and run all believe that had he, the officers with him, and other officers already coming across the compound, could have easily ended the revolt and rescued the hostages, including Floyd.

7. According to the sworn testimony of Lt. Brian Vanes at the criminal trials of inmates accused of killing officer Floyd, he arrived at JTVCC on February 2, 2017 about 11:00 AM. Once there he was put in charge of the effort to retake control of C-19 to retake control of it from the inmates. By 11:30 AM he had assembled a team of approximately 40 tactical operators and was waiting for the green light to enter the building. (The tactical operators were part of the DOC Correctional Emergency Response Team, also known as CERT., hereinafter all CO's who helped retake building C-19 will be individually and collectively referred to as "CERT".) A fully equipped CERT could have easily moved in and rescued the hostages; however, on information and belief Commissioner Phelps and/ or DOC executives delayed the re-taking of C-19 until about 4:45 AM the next morning.

CERT met no resistance and rescued the hostages, but it was too late to save CO Floyd who had passed away from his injuries. Inmate Berry testified at the criminal trial that what Vanes said about CERT meeting resistance was not true. "No one is resisting the doors are shut. They come to your door one at a time and they pop the door."

8. February 2, 2017, CERT equipment did not include balaclavas to hide the wearers identity, and CERT members wore their name tags, and did not cover them with tape. Yet CERT members who entered C-19 on February 2, 2017 wore balaclavas and covered up or didn't war their name tags. Their joint decision to hide their identity in these circumstances was made because they knew that they were going to illegally brutalize the inmates in C-19 and did not want to be held accountable for their actions. They could not have done this without approval by their supervisors. CERT and their supervising officers, including Lt. Vanes, knew there were no cameras to record their actions in C-19, and that a reasonable thing to do to preserve evidence for possible criminal charges against inmates in C-19, would be to arrange for a videographer to record the scene before evidence was altered or destroyed. In fact, according to the sworn testimony at one of the criminal trials by videographer Jeffrey Smith, he was at JTVCC outside building C-19 before CERT entered C-19. So despite having all night to plan the hostage rescue, during which dozens of police cars, fire trucks, and rescue vehicles of all types were summoned

to JTVCC, and the presence of a videographer on the scene prior to CERT's entry into the building, the supervisors decided against having a videographer record what happened to the inmates inside or outside of C-19. (Attached hereto as Exhibit C). They only asked videographer Smith to start filming the inside of C building after most of the inmates had been removed and did not ask him to film inmates inside or outside the building. Videographer Smith testified that there was a trail of blood in the yard leading up to the doorway of building C. He further testified that he arrived at building C, at 5 AM and there was another technician there who did the same job is him at that time. But there was no discussion about filming the retaking of the building or filming the inmates or being taken out of the building.

9. CERT and their supervising officers, including Lt. Vanes, knew there were no cameras in C-19, and that a reasonable thing to do to preserve evidence for possible criminal charges against inmates in C-19, would be to arrange for a videographer to record the scene before evidence was altered or destroyed. In fact, according to the sworn testimony at one of the criminal trials by videographer Jeffrey Smith, he was at JTVCC outside C-19 before CERT entered that building. So, despite having all night to plan the hostage rescue, the supervisors only asked Mr. Smith to start filming inside C-19 after most of the inmates had been removed, and they did not ask him to film inmates inside or outside the building. They obviously did not want to video evidence of CERT's criminal abuse of inmates.

10. The inmates not involved in the revolt, including plaintiffs, were terrified of the hostage-taking inmates and feared for their lives. When ordered to empty their locker boxes, place the boxes outside of their cells, cover their windows, and stay in their cells, they did. For approximately 18-20 hours, the inmate hostages were expecting that CO's would rescue them. About 2:30 PM on February 1, 2017 the hostage takers released a group of inmates who they had been holding, and then released a second group of inmate hostages at 7:50 PM. Both groups of former hostages informed DOC personnel that the vast majority of the inmates still inside C-19 had nothing to do with the attempted takeover and were in fact being held against their will.

11. Around 5:30 AM on February 2, 2017, Lt. Vanes and about 51 CERT members broke through the barricaded front entrance of C-19 and easily regained control of the building. They made no effort to distinguish the hostage-taking inmates from the inmate hostages. They shouted instructions to the inmates from outside their cells and told them to lie on the floor with their hands behind their backs. Most of the inmates had already done that and the rest complied with the order. Despite the inmate's compliance and non-resistance, two or three CERT members entered each cell, jumped on the inmates' backs, put extremely tight zip-ties on their wrists, and kicked, stomped, stood on, and spit on the inmates. CERT abused the passive inmates with batons, pepper spray and electrified riot shields and

threatened to kill them if they resisted. CERT's verbal and physical abuse was very consistent from cell to cell, as the CERT members clearly had an agreed-upon plan or policy on how to treat the inmates after the building was retaken. CERT members knew they were not being recorded by video, and to further limit the number of potential eye witnesses, they made sure that the most vicious assaults on these defenseless men took place in their cells. They also repeatedly yelled things like "Don't fucking look at me" at the inmates to make it more difficult for the inmates to identify them. After pummeling a handcuffed inmate, they often high-fived or fist bumped each other.

12. After beating the inmates in their cells, CERT would yank them to their feet and forcibly move them out of the building in herd- like fashion, heads facing down, arms forced upward behind their backs as far as the officers could force them, and each man's chest against the back of the man in front of him. (Exhibit A) CERT continually cursed at the inmates and berated them with sexual and racial slurs. CO's lining the way out of the building kicked, punched and shoved the inmates as they went by, knocking some of them to the ground. They threatened the inmates with further physical violence if they did not keep their heads down as they were dragged outside into the frigid winter air. Once outside the inmate, many of whom were wet from the sprinklers in the building, or from getting dragged through water on the floor, were thrown face down on the frozen paved yard with their hands zip-tied

behind them. (Exhibit B) The inmates were very cold as they were not dressed for winter weather and CERT refused to loosen the right zip-ties even when inmates complained that they were losing feeling and/or circulation in their hands.

13. After all the inmates were on their face in the yard, CERT began moving men from the yard to the infirmary where nurses were allowed to briefly examine each man, as the medical department had to clear them before they could be put in disciplinary segregation. Most of the inmates were bleeding and in pain from being beaten but received very little evaluation or treatment for their injuries. The nurses were unable to check some men's blood pressure because the zip-ties were not removed. The CERT members mocked any man who asked for medical attention for his wounds or other injuries.

14. The inmates were then taken to the gymnasium and made to lie down with their hands still zip-tied behind their backs. The gym floor became stained with blood and sounds of men moaning and crying filled the air. A member of the medical staff present at JTVCC on February 2nd saw the injured inmates getting a brief check-up by nurses prior to them being taken to the gym. However, as this staff member has been threatened by one of the defendants and treated abusively by other members of the correctional staff, their name will only be revealed to defense counsel under a confidentiality agreement.

15. The medical staff member will testify to the following:

(A) The CO's allowed the nurses to whom the inmates were taken for an examination before being taken to the gym, only a brief time to examine each inmate. Many of these inmates had visible injuries including contusions and lacerations;

(B) The inmates were hogtied face down in the gym with their hands & feet in the air, lying 2 ft. apart. Black inmates' hands had turned white and white inmates' hands were turning purple. The gym smelled like blood and it was cold and damp;

(C) The inmates in the gym were calling out for someone to help them and were moaning and crying. One inmate was having chest pains and the CO's wanted an EKG performed on him while he was still hogtied;

(D) That they went around every officer available and told them that these men had to have zip-ties loosened so they could get circulation into their hands;

(E) One of the inmates had a broken hand and this person wanted to splint it, but CO's wouldn't allow it. One of the inmates had a badly broken nose;

(F) The CO's would not let the inmates who were beaten get sick call until some of their bruises healed. CO's frequently interfered with sick call, especially after the revolt;

(G) The medical staff at JTVCC was not allowed to provide any medical treatment to inmates, except for things like administering insulin, for at least a month after the revolt;

(H) Some CO's such as CO Beckles were frequently abusive toward inmates, both before and after the revolt;

(I) Sgt. Drace would call people who tried to help inmates "N****r lover";

(J) Lt. Sennett and other officers were observed carrying an inmate who was hogtied to a different place in the prison, when Lt. Sennett spit on the inmate.

16. When they finally removed the zip-ties around 12:15 PM on February 2, 2017, they pushed the plaintiffs and other inmates into segregated housing units (SHU) with some inmates having a "celly" and others by themselves. The cells were unheated and filthy, and often contained nothing but a thin plastic "mattress". The inmates had no property except the clothes on their backs, and for days the officers

denied them necessities such as, bedding, footwear, soap, toothbrushes, and clean clothes. For a period of time they were not permitted any communication with their lawyers or their family members.

17. Throughout the day on February 2, 2017, CERT and other CO's continued, without any justification, to physically and verbally abuse the restrained incapacitated men who had been hostages in C-19, and to some extent that abuse has continued as retaliation against men who were in C-19, especially if they are plaintiffs in this complaint.

18. The coordinated abuse began on February 1, 2017 when the inmate hostages released early were beaten and treated by CERT as if they were the instigators for the revolt. However, when CERT finally entered C building on February 2, 2017, the scope of the abuse greatly expanded as there were many inmates in the building and CERT made sure that all of them got their fair share of abuse both in C building and after they left C building. In order to illustrate the brutality of CERT in C building, plaintiffs are highlighting the experiences of some of the men who endured it and whose experiences were common to all of the inmates in C building.

**FEBRUARY 2, 2017 EXAMPLES OF ABUSE TO INMATES**

19. Plaintiff Rittenhouse's ordeal is typical of the abuse that many inmates suffered on February 2, 2017 and the days immediately following. When he realized

officers were coming into C-19, he laid on his stomach on his cell floor with his hands behind his back. He heard the cell door being opened and someone telling him, "Don't move, m***er f***er!" CERT members zip-tied his wrists, kicked his legs, and punched the back of his head, his ears, and the right side of his face. After they yanked him to his feet and pushed him out the cell door, one of them punched him in the stomach. As they pushed him down the hallway, he passed a line of armed and masked officers, some of whom punched or kicked him. Near the exit door they threw him into a chain-link fence and told him to "stop resisting" even though he had been fully cooperative.

(A) Once outside, the CERT members told Rittenhouse, "Get down on your f***ing knees!" as he complied they pushed him violently forward from behind so that his head, face and ear hit the asphalt. His face was scratched, cut, and bruised. When he tried to politely tell an officer that the ties were painfully cutting into his wrists, the officer stood on his back and wrists and told him to shut up.

(B) After Rittenhouse was outside for a long time, face down on the yard with the other inmates, CERT took him into the infirmary, where he noticed a puddle blood, spit, and vomit on the floor. Someone from medical staff asked his name where he was hurt, etc. He said his sides, head, and ears hurt and he could not feel his right hand. After about 30 seconds, CERT yanked his arms up high behind his back, and began pushing him along while pushing his head down toward the

ground. He could hardly breathe and by that time, his pants were around his ankles and were tripping him. They put him in the gym with other inmates, and about 10 A.M. they transferred him to a cell in the SHU with another inmate who had also been beaten. Rittenhouse was wet, had dirty clothes, had blood all over his head and face, and was bleeding from his right wrist and both knees. He was not given clean clothing, sheets, blankets, soap, or toilet paper, and the cell contained only a plastic-coated mat to lie on. He got nothing to eat till late that evening. Soap and toilet paper came late on February 3, and clothing and a bed sheet came a few days later. He was in that cell for about a week before staff allowed him out to shower and use the phone.

20. On February 2, 2017, defendant Payton came up behind plaintiff McCoy and whispered, "It's me, Payton," as he punched McCoy in the arm, squeezed his shoulder blades, and tried to break two of his fingers. When defendant Payton took McCoy back to his new cell after the CERT team abused McCoy, Payton told McCoy "you're going to be convicted of murder, and you're going to spend the rest of your life in here with me." Payton then asked another CO "Is there any cameras?" Then Payton punched McCoy in the jaw and commented on his head wound and told McCoy, that happened from sucking some c**k." Payton stuck a finger in the wound, and as he was leaving, he bent and twisted McCoy's arms, saying "Let's go, get your fat a** up, n***er!"

(A) Later when McCoy was outside of C-19 Payton told him, “Get on your f***ing knees, n***er, get on your f***ing knees now!” Payton twisted his arms and cuffs and later, as they were re-entering C-19, Payton slammed his head into a door.

21. Plaintiff Michael Wells filed grievances around February 9, 2017 related to the assault he encountered by CERT but did not get a response. He also grieved his housing situation. Since 2/2/17 he had one sheet, inadequate clothing and was in a very cold cell. The response: this is a Request which is not processed through the grievance procedure. Inmate clothing requests are submitted via the 4-12 staff not to the grievance office. Once you don't receive your clothing after 30 days, please submit another grievance explaining your concerns.

(A) In his February 18, 2017 grievance, Michael Wells wrote “I am grieving the brutal assault upon me by CERT officers on February 2, 2017. Shortly after 5 AM CERT entered unit C A-tier and told us to lay on the floor with hands behind our backs and not to look at them or they would kill us. My celly and I complied but when they enter the cell a CERT officer e landed with a knee on my back and my leg. He zip tied my hands so tight it interrupted blood flow. He continued to yell obscenities and threats. He punched me in the side of my face and ripped off my sneakers. He grabbed my arm with one hand in the other went between my buttocks with fingers outstretched into my rectum area. He hosted me up and on

the way out of the cell steered me into the wall with force for five times. A CERT officer kneed me and kicked me in the side, hip and leg. I was punched repeatedly at the door. I was dragged through water down the hall and slammed face first onto the concrete. I have horrible nightmares, my knee is still bruised, my hands are still numb, except for shooting pains I have blurry vision, headaches and pain in my side."

22. Plaintiff Ronaldo Williams was in C building at the time of the revolt and was transferred to SHU with the others. All his property was taken or destroyed including the pictures of his daughter. Ronaldo says that CERT went crazy when they found Floyd's body and beat everyone up. He was abused like the others in C building and suffered a swollen face and has had back pain and trouble breathing since his injuries. He had no feeling in his wrist which was purple for approximately 6 to 7 months. He is still struggling with his mental health.

23. Victor Grantham was in C building at the time of the revolt and he and his cellmate Morton were some of the first ones taken from C building. Victor was laid in the hallway on the floor then picked up and kneed and punched in the face. His head was slammed against a metal fence. The zip ties around his wrist were so tight they caused deep bruising and as of August 24, 2017 he still had marks on his wrist. To date his left eye is still slightly colored. He suffered both a swollen mouth and eye as a result of the trauma he endured.

(A) Grantham was taken to the yard, to medical, to the gym, and to SHU while suffering the same treatment as the other inmates. CERT members kept telling them “don’t look at me”. There were no clothes or sheets for days, and they were not permitted to shower for a week. He recalls about three shakedowns since then, since he got including the one on March 9, 2017. He also describes CERT forcing them to put their hands on their buttocks, scrotum, and then in their mouth during the strip search. Another similar search happened approximately two weeks prior to August 24, 2017.

(B) On August 25, 2017 Grantham was in the SHU where he was locked down 23 hours a day. The CO’s constantly disrespected and physically abused him and other inmates. Mental Health was lacking. A month prior he had requested to see a mental health counselor, yet no appointment was scheduled. It took three weeks for sick calls to be answered while in SHU.

24. Frederick Clifton woke up in C building on February 2, 2017 to inmates screaming. He could hear the screams getting closer until CERT came to his cell. He was violently assaulted like the other inmates once they entered. His celly was Roy Alford who also was assaulted. Frederick was beaten “gauntlet” style by many officers as he was removed from C building and taken to the yard where he was slammed down on the pavement. Eventually he was taken to medical but given no treatment before he was taken to the gym where everyone was moaning and

groaning. At the gym CERT jumped on his back and kneed him in the face. He was in a pool of sweat and eventually passed out. He was taken to medical for eight days because of an irregular heartbeat. To date he has a heart murmur and is on medications. Currently he struggles with constant back issues because a CERT officer jumped on his back during the assault.

(A) Clifton was also a victim of a massive strip search in the SHU in March 2017 when CERT came and made everybody strip and put their hands on their genitals and buttocks before putting them in their mouths. Inmates were told to keep their heads down and not look at the CERT members who had their faces concealed with masks except for Lt. Drace. CERT destroyed their property and trashed their cells.

(B) Frederick never received his property back which was taken or destroyed by CERT.

25. CERT arrived around 5:30 AM on February 2, 2017 and announced " "All right motherfuckers, you pussies, when we come to your cell we want you on the floor face down with your hands behind your backs. If there is no room on the floor, lay on top of your celly since that's what you do anyway. If you look at us or resist we will fucking kill."

26. Marvin Mencia heard them yelling "Let's get some". All he could hear were cries and screams as they approached his cell. They took his cellmate out first,

kneeing him and punching him after he had been handcuffed. Two CERT members came to get Marvin which one kneed him in the lower back than grabbed his hands and cuffed them extremely tight. The other kneed him in the back several more time while punching him in the back of his head and face saying, “You should’ve gotten out when you had the chance motherfucker.” The punches left Marvin bruised and in pain causing his left eye to swell shut. CERT took his shoes and pulled him up from the ground by his arms hyperextending them behind his back. They drug him out of his cell screaming “ Get up motherfucker,” but Marvin was dazed and could barely walk. In the flooded hallways they dragged him causing his pants to come off leaving him in a shirt and underwear. CERT continued to drag him into the yard throwing him on the concrete causing scrapes of his right knee and injuries to his face. He remained on the cold ground in his wet shirt and underwear for more than 30 minutes. When they finally pulled him up and took him to see the nurses, the nurses asked how he was feeling, in which he replied “my head hurts really bad, I can’t feel my hands, the left side of my face feels numb, and my knee and lower back hurt.” The nurses looked at his hands and told CERT to take the cuffs off because they were cutting off his circulation. CO’s ended up cutting off the handcuffs and replacing them with zip-ties which again they made really tight. CERT pulled him up by his arms hyperextended so far until his shoulders were coming out of socket taking him to the gym where many other inmates from C

building were lying on the floor badly injured and crying in pain, screaming "I can't feel my hands." Other were bleeding from their noses and mouths. CERT threw him on the floor and for roughly the next 30 minutes, inmates were constantly requesting their zip-ties be loosened.

(A) When Mencia was taken to building 19 he was still wearing only the wet shirt and boxer underwear. He was placed in a cell with another inmate who was also badly injured. In the cell he was left for over 24 hours to lie on a dirty plastic mattress with no sheet or blanket, or any other source of clothing for warmth while cold air came through the vents. A sheet and some clothes were delivered a day later.

(B) For the next 14 days Mencia was permitted no phone calls, no writing supplies, and had no way of communicating with his family or lawyer. Although some of his injuries resolved he still experienced extremely bad headaches, ringing in his left ear, back pain and his right knee is scarred. He was emotionally stressed and mentally traumatized as a result of February 2, 2017. Sleeping was difficult due to his headaches and he had constant nightmares about what happened in C building.

(C) During Marvin's brief assessment on February 2nd it was noted that he had a laceration above his left eye and the left side of his forehead had a notable lump. He was bleeding from his right knee and complained of significant

pain in his hands. Over the next two months Marvin filed multiple mental health and medical sick call forms with only sporadic responses from the medical department.

27. Roy Alford suffered injuries to both shoulders from his constraints and CERT team members stomping on his back. While in the gymnasium, Roy reports witnessing many injured inmates zip-tied and thrown on the floor.

28. Bruce McConnell convulsed and fainted. He was then placed in a wheel chair and rushed out of the gymnasium.

29. Aaron Lowman was violently taken into custody, kneed, and zip-tied in his cell. He was punched and kicked by multiple officers and sprayed in the nose with some liquid. He was removed from C Building and tossed into the yard where he sustained injury to his eye and ear.

30. Eugene Wiggins was assaulted on February 2, 2017 while lying down with his hands behind his back. He was dragged out of his cell, shoes taken off, punched in the face, and given a black eye. By the time he was seen by medical on March 12th all his injuries had healed.

31. Millard Price was a plaintiff who was unable to identify any CERT members by faces on February 2, 2017 but could identify Lt. Sennett by his voice. He remembers Lt. Sennett threatening him because he couldn’t bend forward due to his bad hip.

32. Marcus Rosser was beat up on February 2nd by CERT members. They beat him up and fractured his nose. He was left in the gym for 4 hours with his hands cuffed behind his back lying on his stomach.

(A) Once he was moved to building 19 he had only boxer shorts on. He did not receive any change of clothes until February 4th. He did not see a doctor until February 24th, and on February 28th an X-ray was performed. On March 15th, Rosser learns that his nose was in fact broken but not out of place.

33. Masked defendants harassed and beat Fenel Baine during the February 2nd assault. They taunted him with obscenities and threats of further violence. He was handcuffed and pushed to the ground. The handcuffs eventually began to cut off circulation in his arms. A CERT team defendant ordered Baine to remove his boxers in front of a group of CERT members so they could examine his genitals. He was told to bend over and cough twice because the first time he coughed; per the CERT team it was not satisfactory; which resulted in Baine being humiliated by this sexual abuse. He was told to run his fingers around his gum line despite not having washed his hands after using the bathroom hours earlier. The commanding officer then put his fingers in Baine's mouth. Baine developed a rash (medical injury) on both of his arms and his face after these events and got ulcers in his mouth and small cuts from the officer's gloves. He experienced various bruises on his head, face, and back.

34. Inmate Jarreau Ayers had his pinky finger broken while being handcuffed on February 2nd and received no medical attention until March 6th. As a result, his pinky finger is permanently damaged. Ayers witnessed defendants break Mark Parnell's hand and slam Joseph Galloway's face causing it to bleed. He observed that Shamus Rowley's head was swollen three times its normal size. All injured inmates were denied medical treatment except Motrin for 2-4 weeks.

35. James G. Wells was badly beaten and suffered head injuries on February 2, 2017 but received very little medical care. He suffered physical and mentally because of the beating. James believes CERT members included E. Lehman, C. Kearney, Dale. Raines, Coverdale, Heritage, W. Wells, Michael Mitchell, Lt. Todd Drace. Some CO's threatened to kill him.

36. Every unusual event at a DOC facility is to be noted in "Incident Reports" written by DOC employees or agents. All uses of force must generate a "Use of Force" reports. These reports by necessity, are written after the events being reported. Lt. Vane has claimed that CERT did not have time to stop and complete Incident or Use of Force reports once they entered building C. However, since the practice has always been to complete such reports after the event, CERT has pointed to no reason that they could not have done that for this event as well. Furthermore, all of the inmates were in their cells when CERT came into the building and CERT had time to go cell to cell extracting the inmates at a pace of their choosing. Sworn

testimony from the criminal trial puts the completion of removing the inmates from C-19 well past 6 AM, meaning that CERT took over 40 minutes or more to empty the building.

37. CERT and the CERT supervisors decided not to videotape the events in C building, and allowed CERT members to hide their identities when they went into C building, therefore Incident and Use of Force reports would have been helpful in determining how a trail of blood at the entrance to C- 19 ended up where it was. The failure of CERT to write reports permitted by CERT supervisors and was part of the conspiracy to hide the brutal abuse of inmates by CERT in C-19.

38. CERT and other CO's acting together, have continued to torture, abuse and retaliate against inmates since the revolt in C building. Their actions are quite frequently aimed at inmates who were in C building, but they also have been known to abuse inmates who were not in C-19.

**DOC EMPLOYEES AND AGENTS BEGAN TO SYSTEMATICALLY TORTURE THE MEN WHO WERE INMATE HOSTAGES AT JTVCC BUILDING C-19 BEGINNING ON FEBRUARY 2, 2017**

39. Thereafter, the defendant CO's continued to abuse and mistreat the plaintiffs and other inmates as if they had participated in or supported the attempted takeover on February 1, 2017, without any evidence to support that notion. Defendant Mintz told plaintiff Adger, "Do you think your time is going to get any easier for what you did? It just got harder." On February 4, 2017, defendants

McCormick, Motto, Waltz, Williams, and other unidentifiable CO's/ CERT members beat and otherwise abused plaintiff Carter and many others, including hog-tying Carter and taking his knee brace. The other plaintiffs cannot identify all of their assailants because of masks, riot helmets, and missing or obscured name tags, the plaintiffs' faces being held against the floor or ground, the CO's/ CERT members yelling at the plaintiffs not to look at them, the CO's/ CERT members pepper-spraying the plaintiffs' faces, and/or the assaults including blows to the head or face, etc.

40. Inmate Kenneth Adams was assaulted by Lt. Todd Drace, CO's Gary Griffith and Joshua Peppers on February 6, 2017. Adams was being moved from one cell to another when he, while handcuffed, was shoved by Drace into a control panel with the help of the other two officers. The impact split open Adam's face, and blood covered the side of his head. Afterwards Drace denied him medical attention until Lt. Goldman observed blood on Adam's face and ordered CO Vermon to get the nurse.

41. Sylvester Shockely and his cellmate David Miller were assaulted by CERT on February 7, 2017. CERT officers were all dressed in black with masks covering their faces. The only member whose face was not covered was Sgt. Forkum, but inmate Miller thinks Sgt. John Faulkner Jr. was also involved. CERT sprayed pepper spray directly into David's mouth causing it to go directly into his

lungs. They picked David up and tossed him out of his cell so that he landed face first on the floor. David was handcuffed after he landed. On the way out of W building he was tossed twice more. Miller suffered serious physical injury to his face and has a long scar on his chin that is probably permanent. Miller does not remember being tossed downstairs as some witnesses have reported, but he did black out and doesn't remember some of the assault. Nurse Andrew saw Miller briefly in booking and receiving, but it was about a week before he saw a doctor. For eight days Miller was unable to shower and wash the dried blood off of him, due to not being given a towel. He was written up for assaulting an officer, was not able to call witnesses in his defense, and was found guilty of resisting and disobeying.

42. On February 13, 2017 the defendants turned off the water supply to at least one JTVCC building from 9 AM until 7 PM, leaving the inmates unable to wash their hands, brush their teeth, or flush the toilet. CO's stated the water was off because the CERT team was coming. When the masked and unidentifiable CERT team came into the west side of the building, where plaintiff Baine resided, they shouted obscenities at the inmates, threatened to kill them to avenge Floyd's murder, and threatened to pepper-spray and otherwise assault them if they did not remain quiet and comply. They commanded Baine to remove his boxer shorts so they could examine his genitals, forced him to put his unwashed fingers in his mouth, and made him bend over and cough twice. They handcuffed Baine so tightly his hands turned

blue, and when he protested they shoved him into the concrete floor and shoved his forehead into a wall and then forced him to sit in his knees for 90 minutes.

43. Defendants Chaliss, Drace, Damonski, Evans, Forkum, Payton, and Radcliffe, in addition to the unidentifiable CERT members, physically and verbally assaulted plaintiffs Bishop, Drake, John Dupree, Durham, Keyser, Anthony White, Woodard, and others.

44. Unidentifiable CERT members strip-searched Michael Keyser, refused his multiple requests to be allowed to go to a restroom, then ridiculed him when he urinated on himself, asking him if he needed a diaper. One of the CERT members repeatedly stepped on his toes, eventually causing significant injury resulting in him not being able to put weight on that foot and discoloration (possible fracture) of one of his toes.

45. On February 14, 2017, over twenty of the defendant CO's, including defendants Burris, Chance, Connor, Conrad, Coverdale, Dunlap, Gill, Gordon, Heritage, Kuhner, Kushner, Lehman, Milligan, Kirk Neil, Lyle Neil, Rains, and West, as well as unidentifiable CERT members in full riot gear, burst into MHU Building yelling threats, obscenities, racial epithets, and homophobic slurs. They sprayed pepper spray into each cell, sometimes under doors and without warnings, and then assaulted the inmates even though the latter were doing nothing wrong or aggressive. CO's yelled, "It's payback time," "You thought this was over," and other

threats and taunts. The CERT team beat plaintiff Caldwell so badly they fractured his femur. They also beat plaintiffs Douglas, Kane, Jackson, and others. Plaintiff Douglas heard them assaulting plaintiffs Kane and Jackson, and plaintiffs Lucas and Reeder witnessed the assault on Douglas. The CERT members and CO's strip-searched plaintiffs Boyer, Cannon, Cruz-Webster, Dillard, Foreman, Goddard, Jackson, Newton, Teagle, Wheeler, and Wood, as well as other inmates. After they allowed the inmates to dress the inmates were cuffed with their hands behind their backs.

46. Defendants Connor, Coverdale, Kuhner, Milligan, Kirk Neil, Lyle Neil and Rains beat, punched, kicked, tased, shocked, stomped on, and kneed plaintiffs Caldwell, Wheeler, and Wood and at least one other handcuffed inmate severely, or those CO's stood by watching, doing nothing to stop that abuse by others to these inmates during the February 14th assault.

47. Defendant Kuhner beat plaintiff Cruz-Webster while other CO's/CERT members either assisted or watched without doing anything to stop Kuhner on February 14th.

48. On February 14th CO's and CERT members forced the inmates out of the building with their heads down and cuffed hands at or above shoulder level, screaming, "Look at the f***ing ground!" and "Don't f***ing look at us!" They held plaintiff Wheeler's face against the floor and later a table and ordered the other

inmates to kneel with their legs crossed and their hands still cuffed behind their backs for hours. When the inmates were finally allowed to return to their cells, they found their personal property disheveled and other items broken or missing. Inmates sent grievances to defendant Reynolds as instructed, but they received no responses.

49. Defendants Connor, Coverdale, Dunlap, Lehman, Milligan, and Rainey verbally and physically assaulted plaintiff Johnson on February 14, 2017, and he believes defendant Coverdale was the one who sent tear gas or pepper spray into his nose and mouth. As they dragged him along the floor nude, one CO remarked, "This is like dragging a dead deer." At least one of the CO's bragged, "M***er f***ers will learn who is in charge tonight!"

50. Sye Newton recalls the February 14th as follows: "On February 14th around 11:32 PM, more than 20 DOC employees (CERT) wearing masks and carrying electric shock shields, batons, and Cap-stun canisters (pepper spray), stormed onto the tier yelling threats, obscenities, homophobic slurs and racial epithets. CERT went cell to cell spraying Cap- stun into the cells for no reason other than to torture the inmates, then they beat and abused all of the inmates saying, "man up bitches it's payback time", "fucking faggots", "assholes" "y'all thought it was over.." etc…"

(A) All of the inmates were strip-searched and after their clothes were returned they were cuffed and CERT forced their arms up past her shoulders

and forced them out of the building, shoving their necks down, yelling "Look at the fucking ground, don't fucking look at us". Inmates were then ordered to kneel with their hands cuffed behind their backs and legs crossed beneath them for nearly 2 ½ hours. When finally taken to the cells, they discovered their property and documents were thrown all over the cell, and many of their items were destroyed. This was not spontaneous behavior but was orchestrated and coordinated at various levels of management. The institution's warden would have to approve, and CERT is comprised of CO's from prisons throughout the state, and they were issued special gear, so many individuals with supervisory power had to be involved, to make this happen. The only CO involved in the 2/14/17 assault that I could identify was Cpl. Burris, the one who forcefully stripped me of my clothes, and I was close enough to recognize him by his voice, build, mannerisms, and eyes. My property broken during the 2/14/17 ransacking of my cell, included a radio antenna, watch, and headphones. I have a folder filled with complaints returned as "unprocessed/non-grievable".

51. On Febraury 15, 2017, defendants Gill and Gordon and unidentifiable CERT members pepper-sprayed plaintiffs Caldwell, Crumpler, Jackson, and Mayhew, along with many others in building 23, tier D, even after the inmates had obeyed the CO's/CERT instructions to stand at the backs of their cells with their hands on their heads. Upon entering cells, defendants Gill and Gordon and the CERT

members verbally and physically abused the inmates and shocked them with electrified shields despite the inmates' compliance and non- resistance.

52. On February 27th, defendants Drace, Evans, Forkum, Green, Payton, Phelps, Robinson, Tyson, and Wallace, and CERT members wearing black masks, uniforms, and no name tags, suddenly entered W Building (a minimum-security unit) with guns drawn. They beat inmates, including plaintiffs Jarad Brown, Getz, Lewis, McCullough, John Miller, Mozick, Porter, Shockley, David Smith and other inmates without provocation, ordered some to put feces or contaminated hands into their mouths, pushed plaintiff McCray and others down stairs, and pressed riot batons and/or flashlights against inmates' anal and/or genital areas, including plaintiff McCullough who they knew had a swollen testicle from recent surgery.

(A) Unidentifiable CERT members punched plaintiff Porter in the face, shocked him with an electrified shield, and knocked him unconscious. Defendant Robinson broke plaintiff Porter's TV and laughed about it. Some abuse occurred in the cafeteria with the doors open, even though it was very cold outside, and the inmates were not dressed for cold weather.

(B) One or more unidentifiable CERT members threw plaintiff Alfred Lewis to the ground and breaking his finger. He remembers seeing puddles of blood on the sidewalk outside W Building from all the injured inmates. Defendant Estrada continually abused Lewis after the shakedown.

(C) An unidentifiable CERT member inserted an object into McCullough's anus and, after it dropped to the floor, forced him to put the contaminated object in his mouth and lift his tongue with it.

53. John Miller recalls CERT coming to building W, H tier, shouting at the inmates to stand at their windows backs to the door with their hands on their heads. He heard shouts of payback time. He heard the sound of inmates being shocked with the electric shield. When they came to his cell they told him to face them, strip, lift his genitals, turn around, spread his ass cheeks, squat, cough, stand up, turn around facing them, put his finger in his mouth, and pull his cheeks away from his teeth and lift his tongue. He claims they then sexually assaulted him with an object. Then it was forced in his mouth. His arms were pulled up behind his back and he was taken down the steps and slammed to the ground on his naked buttocks and an officer dragged him by his leg for a few feet. They dragged him to his seat by his arms forced his head down pulled his arms up behind him and walked into the WIAC chow hall where he was placed up against the wall facing it. The same officer was with him the whole time including the assault and he eventually saw him without his mask on and it was CO Jack Evans. Miller tried the PREA hotline without much success and reported his abuse to every high-ranking officer he could think to notify including Warden Radcliffe, but to his knowledge nothing was ever done about it.

54. Plaintiff McCullough has witnessed defendants Arabian and Drace conducting improper shakedowns, falsifying reports, using vulgar language to inmates, and keeping a tier or building on lockdown for no valid reason.

55. Sylvester Shockley wrote a statement of facts on April 23, 2017 regarding the assault on February 27th. He describes the event below:

> " On February 27, 2017 around 1:30 PM 50 members of CERT came on B-tier, in full riot gear with their faces covered with masks. Two members of CERT team to my cell and strip-searched me and then allowed me to put on my underwear, pants, and shower shoes. I was cuffed behind my back and taken to the activity center where I was forced to stand with my feet against the wall, my head down, and my hands tightly cuffed behind my back for about three hours. It was very painful, but I was ordered not to say a word. Upon returning to my cell I found it have been completely trashed so my cellmate and I begin to put it back in order. About a half hour later Sgt Forkum with CERT came to the tier and ordered all the doors shut. At my cell he yelled "be a man and come on out" and said "you had your turn now it's ours." He opened the cell door and ordered me out of the cell. When I came to the door he grabbed my left arm and yanked me out of the cell and slammed my face and body against the wall. He forced my arm behind my back until I thought my arm was being pulled out of the socket. I cried out in pain and Forkum told me to shut up. Then another CERT member grabbed my other arm and they both slammed me to the floor. Yet another CERT member sprayed pepper spray in my mouth which gagged me and caused me great difficulty catching my breath. While I was on the floor someone sprayed pepper spray directly into my left eye for an extended amount of time. I was temporary blinded in that eye. As Forkum was handcuffing me, he slammed his knee into my back very hard and took something with an edge on it and scraped it up the right side of my back leaving a long sore scar.
>
> " As he was doing these things CERT was kicking and hitting me all over my body. They hit my ribs with what I believe was a beanbag gun which was extremely painful. Then someone pulled down my pants and underwear and sprayed my buttocks with pepper spray. CERT then

dragged me off the tier with my pants and underwear down and dropped me on the dirt part of the yard. CERT put his foot on my head keeping my face in the dirt and my private parts exposed. I caught a glimpse of my cellmate being dragged from the building before I was forced to turn away. Eventually two CERT dirt grab me off the ground and bent my head to a point where who is difficult for me to walk and maintain my balance. Four times they dropped me on my face and knees causing me more pain. Each time I was dropped one CERT said things like “Man up; I thought you were a man.” “If you can't get your big ass up we will drag you” he place his foot on my head each time. When I asked for my cuffs to be loosened, he made them tighter causing great pain. I was exhausted; in extreme pain; I had blood and snot running down my face; I could no longer stand; finally, officers carried me into the receiving room I was dumped face down on the floor in a holding cell with my private parts still exposed.

“ The CERT person came into the cell and again put his foot on my head and pressed it into the concrete floor and told me not to move. Eventually he came to the cell and forced me up from the floor, uncuffed one hand and ordered me to fix my clothing to see the nurse. There was a pool of blood and snot where my face had been. The nurse wiped off my face but did not check my other injuries. I was taken to building 18 and put in a holding cell next to my cellmate David Smith. His hands were cuffed behind his back and his face was covered in blood. They took him and then me away in leg shackles and handcuffs and put us in isolation.

“On 2/28/17 a Lt. handed me a disciplinary report by Sgt. Aaron Forkum in which he wrote that I had been noncompliant with CERT operator’s directives and combative. He had no explanation for what that meant and did not list any witnesses. On 3/1/17 about 15 minutes before Lt. Larry Savage conducted my disciplinary hearing, inmate Kevin Washington told me he was going to find me guilty because he had overheard him in the hallway saying that if I had not resisted, he would've found me not guilty.

“ When the hearing began Savage was filling out the paperwork to find me guilty right in front of me. I asked to cross examine Forkum regarding his report but was not allowed to do so. I got 15 days of detention, 30 days loss of all privileges, and 15 days lost of good time.

> I appealed but Staff Lt. Lieutenant Brian Reynolds denied my appeal on 3/26/17. I sent a letter of appeal to Warden Parker but he has not responded to my letter. David Smith did not receive a disciplinary report but on 3/1/17 Savage went to Smith's cell and found him guilty using my disciplinary report."

56. On March 9, 2017, defendant Warden Radcliffe led fifty to one hundred CERT members, including defendants Bliborough, Coverdale, Deally, Drace, Estrada, Figueroa, Frederick, Gill, Green, Johnson, Joyner, MeClain, May, Kirk Neal, Radcliffe, Russell, Rutkowski, West, and Young, wearing masks, dressed in black, and carrying clubs and shields, into Buildings 19-AU2 and 19-C SHU. They strip-searched inmates including plaintiffs Bagwell, Boyer-Smith, Burrell, Congo, George, Harris, Long, Keith Miller, Norman, Porter, Price, Rosser, Steedley, Wells, Wiggins, and Ronaldo Williams in the manner described above, often in the presence of one or more female CO's, and sodomized plaintiff Porter with a flashlight during his strip search.

(A) Defendant Kirk Neil punched plaintiff Norman in the face several times and defendants Kirk Neal, Coverdale, and/ or Rutkowski sprayed Cap-stun (pepper spray) in his mouth. Then the CERT team pushed the inmates outside in cold weather even though they were wearing only T-shirts, pants, and shower shoes, and they forced the inmates to sit cross-legged on the cold ground facing a wall, with their hands still zip-tied behind them for hours. The latter was especially painful for plaintiff Bagwell and others due to their previous injuries.

(B) Defendant Russell ordered other CO's, "If [inmates] talk, move, or ignore an order, light them up!" CO's shot pepper balls at the inmates seated in the yard.

(C) As plaintiff Pierce returned to his cell, he could hear CO's punching other inmates. When the inmates got back in their cells about 1L15 A.M., they discovered that once again unknown JTVCC staff had ransacked their cells. Their grievances were ignored or never processed.

57. On March 19, 2017, Marvin Mencia filed a Grievance about abuse by CERT on March 9th.

> " CERT arrived building 19 and when they reached my cell one said OK back up slowly and I backed up to him. He stopped me with his hands and said "Stop shaking you little scared pussy" he ordered me to take off my shirt and then ran his finger from the top of my back down to my lower back. I had to take off my shoes, boxers and socks and he said, "why are you shaking so much you scared pussy". I was terrified I was going to be beat again like in C building. He ordered me to bend over at the waist and grab my butt cheeks and spread them. I did and he twice said spread them more. He shone a light on my asshole and said, "Hmm damn" and the officers behind him laughed. They laughed again when he made me cough three time. He told me to turn around and stop fucking shaking. The officers again laughed when he told me to "lift up your little ass dick" and "now your balls." I was told to rub my hands through my hair, then run my fingers around my gums. This whole incident made me feel sexually harassed and bullied. I have mental trauma and emotional stress and become afraid any time I am around an officer.

Mencia got back a "Returned Grievance."

" To Marvin Mencia from Warden Timothy Radcliffe. (Date 03/21/17)

> I have received and reviewed the grievance form returned to you as a "staff issue" dated 3/19/17. Please be advised that I am fully aware of your stated issues and take them seriously. Strip searches and shakedowns conducted as part of security practices are performed in accordance with Department of Correction policy. I will address this issue with staff to ensure that they are conducting searches in accordance with policy."

58. On March 22, 2017, defendant Tyson confiscated plaintiff McCullough's TV "on orders from" defendant Brennan, and in the same time period defendant Phelps, knowing of McCullough's recent testicular surgery, stepped on his groin to make McCullough give up grievance paperwork.

59. On March 27, 2017, unidentifiable CERT members strip-searched and abused, both physically and verbally, plaintiff Lewis and other inmates, and defendant Figueroa spit in plaintiff Purnell's bowl and threw Purnell's toothbrush in the toilet. Defendant Estrada continued his abuse of plaintiff Lewis on March 29, 2017.

60. On March 31, 2017, unidentifiable CERT members strip-searched and abused both physically and verbally, plaintiff Szubielski and other inmates.

61. On April 12, 2017 around 7:00 PM, roughly 50 CO's, including defendants Forkum, Payton, and Stewart of the Quick Response Team ("QRT"), performed another "shakedown" in the A and D tiers of building 23. They ordered inmates, including plaintiffs Lacombe and Bagwell, to strip naked in front of several officers and cell mates, then they handcuffed the inmates and forced them outside

with the inmates' feet bare. The CO's ordered the inmates not to look at them, then forced the inmates to sit on the pavement with their legs crossed and heads down for 1.5 to two hours, as the guards stood behind them with their guns drawn, laughing and enjoying themselves. When the inmates were allowed back in the building, they found once again that their personal property was missing, damaged, or strewn around their cells. In particular, unknown JTVCC staff had poured water on plaintiff Lacombe's books and legal and personal documents, ruining them. The plaintiffs do not know which JTVCC staff members damaged and destroyed their personal property, since they were in the yard while the damage and destruction occurred, and no staff member left any documentation indicating which cell(s) he or she shook down.

62. The inaction and acquiescence of defendant Warden Radcliffe and others in supervisory roles has emboldened CO's like such as defendants Mock and Savage, who have said to plaintiff Lacombe, "I can injure you now and get away with it," "Just look at me wrong," and similar threats.

63. In August 2017, the Independent Review Team ("IRT") appointed by Governor Carney after the February 1 attempted takeover issued its Final Report, which among other conclusions notes "a pervasive culture of negativity" and "an overall atmosphere of disrespect" at JTVCC. The IRT interviewed inmates as well as staff and noted "allegations of consistent mistreatment, neglect, and abuse by the

JTVCC staff towards inmates, both prior to and after the incident that began on February 1, 2017." As one of the interviewees stated, "Some groups of officers feel empowered to be vulgar, provocative and harassing to inmates."

64. Despite DOC's assurances the Governor Carney that it was taking the IRT's recommendations seriously and intended to make major improvements, the CO's and CERT members at JTVCC continued to abuse and mistreat inmates.

65. On or about March 15, 2018, Atherholt broke off plaintiff Martin's radio antenna and cited him for allegedly having a "shank." On April 17, 2018, defendant Atherholt verbally and physically abused plaintiff Martin, who urinated blood for days thereafter.

66. March 31, 2018, CO's strip-searched about fifty inmates in B-Annex by order of defendant Satterfield. The CO's forced the inmates to spread their buttocks in the direction of cameras. When several inmates complained, the CO's threatened to send them to "the hole," (meaning solitary confinement). When the prisoners contacted the PREA hotline, they spoke to a rude, condescending, and insulting female officer answered.

67. Many JTVCC inmates who were considered potential witnesses in the criminal trial of the hostage takers were transferred to Howard R. Young Correctional Institution ("HRYCI") in Wilmington. CO's regularly harassed the potential witnesses because they are plaintiffs in this lawsuit, denying their requests

for showers, recreation, and personal hygiene items, serving them cold or foul-smelling food or tiny portions, causing some inmates to lose up to 20 pounds in 3-4 months, and verbally and physically abusing and threatening them.

68. On October 31, 2018, unidentifiable CO's strip-searched all inmates on the "potential witness" tier at HRYCI on camera and verbally humiliated them. The CO's then took the handcuffed inmates outside in 50° weather with minimal clothing and made them stand in the yard with their faces against a wall, with K-9 dogs guarding them. Then the CO's took the inmates to "medical" and forced them to undergo abdominal x-rays against their will. The radiology technician told inmate Cornell Hester that she had been instructed not to put a lead apron on inmates when she was x-raying them. Several hours after being taken to the yard, inmates returned to their cells to find that CO's had damaged or destroyed their personal property.

69. There could not have been any reasonable suspicion that those inmates, each of whom had been incarcerated for substantial amounts of time, were concealing anything in their bodies that could be seen only on x-ray. Furthermore, DOC's search policy 8.32 states in part:

> **D. "Searches for Ingested Drugs or Contraband**
>
> 2. If there is a reasonable suspicion that an offender has ingested drugs of other contraband, the offender will be separately housed in a dry cell....

> 3. Offender will be held for a period of time to allow passage of the drugs/ contraband out of the body by natural functions"…

70. On November 7, 2018, CO's put Victor Grantham at JTVCC under strict lockdown and shut off the water on his tier for hours. Nurses told inmates who needed water to assist with taking medication that they would need to wait for that medication until the water was turned back on. Defendants Estrada, Lance Green, and ten to thirteen additional CO's, all fully armed and with K-9 dogs, strip-searched the inmates in Victor Building, some making lewd and insulting comments to the inmates while others took or broke inmates' belongings.

71. The following plaintiffs were among the inmate hostages in building C-19 on February 2, 2017, and were forced to leave all of their property, except the clothes on their backs in the building when they were dragged out of C-19. Almost all of the property was disposed of by DOC employees or agents without any accounting for it by DOC. There are many other men who had property taken or destroyed during the CERT shakedowns. Many are not on this list but lost some of the same items as listed below. During shakedowns CERT invariably broke the hooks off the cell walls that the men had purchased from the prison commissary:

Plaintiffs Adger, Allen, Anderson, Baine, Bagwell, Bennett, Berry, Bishop, Bramble, Burrell, Cannon, Caraballo, Clifton, Collins, Congo, Damiani-Melendez, Daniels, . Desmond, Dickerson, Dickson, Dillard, Douglas, Drake, Drumgo, Kurt

Dupree, Fogg, Foreman, Grantham, Hand, Hester, Hibbs, Keyser, McCane, McCullough, McLaughlin, Mencia, Michaels, Norman, Pendleton, Price, Purnell, Rittenhouse, Rosser, Roten, Sartin, Sierra, David Smith, Wade Smith, Stevenson. Sykes, Szubielski, Teagle, Joseph Wallace, Walley, James Wells, Michael Wells, Eubanks White, Wiggins, Dennis Williams, Ronaldo Williams, Wilson, Wood, and Woodard.

Many other men not named above also lost similar property during the CERT shakedown.

72. The property destroyed was all or virtually all the property these men possessed at the prison and included such as those outlined in Exhibit D, attached hereto.

**EXAMPLES OF DOC STAFF RETALIATION AGAINST INMATES SINCE FEBRUARY 2, 2017**

73. On September 3, 2017, plaintiff Nathaniel Bagwell was coming from the yard and upon entering the building, an officer took Bagwell's envelope containing several drawings and written documents out of his hands, hit him, and refused to give the envelope back. Sgt Nathaniel Payton pepper sprayed him in his eyes and face and took him to the ground. Sgt. Aaron Forkum knelt on his lower back, handcuffed his hands behind his back, put spit mask on him, pepper sprayed his mask and shirt, and then beat his body and head with handcuffs along with Sgt. Payton. Bagwell was dragged, kicked and stomped on before several guards picked

him up, cuffed his legs, and held him tightly against the wall while Sgt. Nathaniel Payton pulled down Bagwell's pants and underwear and used a baton for sexual abuse. Sgt. Forkum, Sgt. Payton, and other guards taunted Bagwell and called him several foul and derogatory racial slurs throughout the assault. The assault lasted quite a while and involved 12-15 white officers.

(A) Witnesses included: John Dupree, Officer Scott, Sgt. George, Officer Parry, Sgt. Mason, Officer Lowvear, Officer J. Miller, Officer Skinner, and Officer Cannon.

(B) Bagwell received two X-rays on his buttocks, which showed permanent, severe nerve damage at the site of the assault. He received a pain patch for his back and drops for internal ear injury. Medical did not provide treatment for severe head, chest, and brain injuries even though Bagwell was vocal about needing to receive treatment for craters in his head.

74. At 9:00 AM on November 6, 2018, the day after many of the plaintiffs in the lawsuit received copies of the lawsuit in their legal mail, CO Estrada and other CO's showed up at Gerard Szubielski's cell door, forced him to strip naked, took him and his two cellys out to the chow hall, and then proceeded to ransack his cell. Estrada took his eyeglasses and a lot of his paperwork.

75. On November 7, 2018, Michael Keyser recalls roughly 12 to 15 CO's came in for a massive shake down in Victor building. Two of the CO's were

defendants Estrada and Lance Green. Inmates in Victor building were pulled from their cells, strip and cavity searched, while other CO's took or broke their belongings. Keyser's TV was shattered. Inmates were threatened with dogs and guards fully armed.

**GRIEVANCES**

76. Michael Wells was a victim of the CERT assault on February 2, 2017 and filed grievances on February 9th but did not get any response. He also grieved his housing situation. Since February 2nd he had one sheet, inadequate clothing and was in a very cold cell. The response:

> " This is a Request which is not processed through the grievance procedure. Inmate clothing requests are submitted via the 4012 staff not to the grievance office. Once you don't receive your clothing after 30 days, please submit another grievance explaining your concerns."

On February 12th he filed a grievance for his property and then on March 22, 2017 sent letters to Deputy Warden Parker, Major Brennan, and Staff Lt. Boone Regarding his missing property.

In his February 18, 2017 grievance, Michael Wells wrote:

> " I am grieving the brutal assault upon me by CERT officers on 2/2/17. Shortly after 5 AM CERT entered unit C A-tier and told us to lay on the floor with hands behind our backs and not to look at them or they would kill us. My celly and I complied but when they enter the cell a CERT officer e landed with a knee on my back and my leg. He zip tied my hands so tight it interrupted blood flow. He continued to yell obscenities and threats. He punched me in the side of my face and ripped off my sneakers. He grabbed my arm with one hand in the other went between my buttocks with fingers outstretched into my rectum area. He hosted me up and on the way out of the cell steered me into the wall with force for five times. A CERT officer kneed me and

> kicked me in the side, hip and leg. I was punched repeatedly at the door. I was dragged through water down the hall and slammed face first onto the concrete. I have horrible nightmares, my knee is still bruised, my hands are still numb, except for shooting pains I have blurry vision, headaches and pain in my side.

77. Will E. Rogers filed a Grievance on February 18, 2017 because he had not been seen by mental health since February 2md. He then filed another Grievance on February 24th about not being seen for sick call since February 2, 2017.

78. In Maurice Cruz- Webster's Grievance on February 21, 2017 he wrote that QRT and CERT beat him up badly on (2/14) and put him in the hole so his family or lawyer couldn't see his injuries. He has received no medical treatment and he's still in the same clothes he got beaten in. J. Kuhner is the only QRT member he can identify. The others had their faces and names covered. Her requested the bureau chief review all the video recordings of the beating, and he wanted the names of the CO's from the incident.

In his 2/23/17 Grievance he wrote that he's still in the same clothes from the night he was beat up.

79. Lammott Stevenson wrote a grievance on February 24, 2017 nothing he had filed numerous sick call request but still had not seen a doctor for his February 2nd injuries.

80. On Joseph Bennet's March 5, 2017 Grievance, he wrote:

> "I was in C building on February 1, 2017 and I need my legal work in order to meet a court deadline. I cannot keep requesting a continuance. Please return my property so I can work on my case."

He got back a "Return of Unprocessed Grievance."

> "Requests are not processed through the grievance procedure.
>
> In your case, C building is currently being cleaned by an independent company. The subject matter experts assigned to complete this task will determine what property is salvageable and what must be disposed of. Once the cleaning of the building is complete, the department attempt to identify ownership of the remaining items, inventory the said property and return them to their rightful owner. This process will take an undetermined amount of time to complete."

81. In the March 7, 2017 Grievance, James Wells wrote he had not seen a Mental Health provider, despite three sick calls for help.

82. In his March 10, 2017 Grievance Mark Purnell described abusive actions of CERT officers searching 19 C-tier on Thursday March 9, 2017.

> "CERT took my cellmate out and told me to take off my clothes including my cast for the broken hand I got on 2/2/17 officers who breached C building. One of the officers told me I wouldn't have to go through things like a strip search and getting my ass beat again if I wrote a letter (kite) saying that they didn't break my hand on 2/2/17, I made it all up. They would say they found it in my cell while conducting a shake down. They told me not to put the cast on while getting dressed. I was told to lay on the ground with my hands flat on the floor and one or more officers stamped my left hand 5 to 8 times, then left me put my cast back on. They cuffed me, took me to the rec yard, told me cross my legs and sit down with my face down, and don't move. I was outside in a T shirt, pants and shoes for over an hour. On the way back to my cell three or four officers told me I had to give them my cast. They told me if I didn't, they would light me up and break my other hand. They told me to listen N****r, I'm only telling you once to hand your cast over or we'll use force.

83. Cornell Hester noted in his March 26, 2017 Grievance that nobody from Mental Health had evaluated him for his mental suffering since February 2, 2017.

84. David Foreman stated in his April 14, 2017 Grievance that CERT beat him up in building 23 on A-Tier on 2/14/2017, but he hadn't gotten the x-rays the doctor promised him.

85. Fred Caldwell wrote in his April 24, 2017 Grievance that he was injured by correctional officers and his femur bone was fractures on February 14, 017 into February 15, 2017. He was denied the proper care until his injuries healed, but still hadn't received proper treatment.

86. In Aaron Carter's May 7, 2017 Grievance, he noted he was extracted from B building by CERT around February 4, 2017 but had received no treatment for his neck injury.

87. In his June 4, 2017 Grievance, Jeffrey Fogg wrote he was supposed to be seen for his February 2, 2017 CERT injuries around May 3, 2017, but he still hadn't been seen.

## DELAYED, DENIED, INTERRUPTED, OR SUBSTANDARD MEDICAL CARE

88. At least the following plaintiffs sustained serious bodily injuries, including but not limited to fractures, suspected fractures, concussions, eyesight or hearing loss, and/or aggravation of pre-existing medical conditions, due to the

assaults by CO's detailed above, and the supervisory defendants denied almost all treatment to plaintiffs, for medical issues for at least a month after February 2, 2017, and continue to look the other way when CO's interfere with medical care needed by plaintiffs.

Plaintiffs Allen, Ayers, Bagwell, Bas craps, Joseph Bennett, Berry, Bishop, Bowers, Brathwaite, Caldwell, Cannon, Caraballo, Carter, Chairez, Chandler, Chapman, Clifton, Congo, Craig, Cruz-Webster, Damiani-Melendez, Daniels, Deberry, Douglas, Downing, J. Dupree, K. Dupree, Elliotte, Fogg, Folks, Foreman, Fullman, Goddard, Grantham, Hester, Jackson, Jones, Keyser, Lewis, Long, Lowman, MacConnell, Majette, Martin, Matthews, Mayhew, McCane, McCray, McCullough, Mencia, Miller, Newton, Ortiz, Parkell, Perry, Porter, Purnell, Rittenhouse, Rivera, Rogers, Rosser, Roundtree, Rowley, Sawyer, Smith, Sommers, Steedley, Stevenson, Taylor, Joseph Wallace, Waller, Walker, Wells, Wheeler, D. Williams, R. Williams, Woodard, and Worley.

## CONCUSSIONS AND OTHER HEAD TRAUMA

89. At least the following plaintiffs suffered concussions and/or brain damage from the defendants' assaults that have or may have impaired their memories:

Plaintiffs Bagwell, Berry, Kurt Dupree, Fogg, Lewis, McLaughlin, Miller, Wallace, Wells.

90. Defendants Commissioner Perry Phelps, Warden Dana Metzger, Warden David Pierce, Warden Robert May, Deputy Warden Phil Parker, Deputy Warden James Scarborough, and Major Jeffrey Carruthers have not or did not show much interest in addressing the unconstitutional criminal behavior by CERT on February 2, 2017, and thereafter as outlined above. There has been no investigation of the widespread criminal actions of correctional officers at JTVCC despite the overwhelming evidence of criminal action by a substantial number of correctional officers, most of whom are still working at JTVCC and have received little if any disciplinary action. The entire episode should have been investigated by an outside law enforcement agency.

91. According to the media relations office for DOC, and inmate at JTVCC was found guilty of  assault in a detention facility on July 20, 2017; an inmate at Sussex Correctional Institution was found guilty of falsely reporting a PREA incident in December 2017;  and, an inmate pled guilty to promoting prison contraband at Baylor Women's Correctional Institution on March 25, 2019. Supervisory defendants have been more than willing to push criminal charges against individual inmates but have excused or covered up far worse behavior by CERT and CO's, when the victims are inmates. Many of the most violent officers who participated in torturing inmates on and after February 2nd, are still at JTVCC and have not been punished for the criminal behavior in the past, nor are they being

disciplined for the ongoing abuse of the inmates at JTVCC. Some things are clearly worse such as the healthcare debacle that seems to worsen every month. There is no evidence that Warden Metzger has done anything but ratify the past treatment of inmates at JTVCC and acquiesce to the ongoing mistreatment of those inmates.

92. The disciplinary rules and procedures are still based on which CO is on duty. Beatings from correctional officers are still quite common, and invariably they're accompanied with false incident and disciplinary reports to justify them. The inmate ends up being beaten for no legitimate reason, and then is disciplined because of the incident which was solely provoked by the correctional officer.

93. Defendants Commissioner Perry Phelps, Warden Dana Metzger, Warden David Pierce, Warden Robert May, Deputy Warden Phil Parker, Deputy Warden James Scarborough, Former Commissioner Robert Coupe and Major Jeffrey Carruthers, knew that:

(A) A culture of violence existed at JTVCC, and that CO's frequently physically and verbally abused inmates without fear of being disciplined;

(B) Inmates at JTVCC were being denied timely care for their serious medical and mental health conditions and that some inmates had serious conditions for which they were receiving no care;

(C) CERT, which was assembled to go into JTVCC, was going to abuse, mistreat, and torture the inmates in building C-19 after they had retaken the building;

(D) That living conditions for inmates at JTVCC, especially those inmates who had been in C-19, were extremely bad by design to punish and abuse the inmates from February 2, 2017 on, this included keeping these inmates in isolated maximum-security housing for extended periods of time without any justification; and

(E) That CO's were deciding what the rules of conduct would be for inmates each shift, so that the inmates had no way to avoid violating them, and that inmates were being punished for violating rules that changed every shift without their knowledge.

94. Defendants Commissioner Perry Phelps, Warden Dana Metzger, Warden David Pierce, Deputy Warden Phil Parker, Deputy Warden James Scarborough, and Major Jeffrey Carruthers knowingly breached their duty to:

(A) Make sure that the inmates at JTVCC received reasonable medical care for serious medical conditions;

(B) Protect the inmates from torture and abuse by CO's in JTVCC;

(C) Prevent CO's from denying inmates adequate food, bedding, toiletries and privileges to which the inmate should have been entitled, such as recreation time, phone calls, and visitations;

(D) Investigate inmates' complaints of abuse and torture at the hands of CERT and CO's and discipline CERT members and CO's as the facts warrant

95. The intentional acts of these defendants constituted:

(A) Intentional infliction of emotional distress; and

(B) A violation of plaintiffs' constitutional civil rights pursuant to *42 U.S.C.* §1983 and their 8th Amendment right to be free of cruel and unusual punishment;

(C) Conspiracy to deny defendant's their constitutional rights by allowing CO's to viciously abuse inmates

while incognito, to try to impede their ability to file civil rights actions.

96. Defendant Timothy Radcliffe was aware of the torture and abuse of inmates by CERT as he is CERT warden and participated in some of their shakedowns at JTVCC. Despite knowing about CERT abuses, he apparently did nothing to stop them., as they have continued through the present.

97. The intentional acts of defendant Timothy Radcliffe constituted:

(A) Assault;

(B) Battery;

(C) Intentional infliction of emotional distress;

(D) A violation of plaintiff's constitutional civil rights pursuant to *42 U.S.C.* §1983 and their 8th Amendment right to be free of cruel and unusual punishment;

(E) Conspiracy to deny defendant's their constitutional rights by allowing CO's to viciously abuse inmates while incognito, to try to impede their ability to file civil rights actions.

98. Defendants Commissioner Perry Phelps, Warden Dana Metzger, Warden David Pierce, Warden Robert May, Deputy Warden Phil Parker, Deputy

Warden James Scarborough, former Commissioner Robert Coupe, Major Jeffrey Carruthers, Captain Bruce Burton, Lt. Justin Atherholt, Lt. Nathan D. Atherholt, Lt. Jason T. Coviello; Lt. George J. Gill; Lt. Melvin B. Harris, III; Lt. Karen Hawkins; Lt. Sean R. Milligan; Lt. James P. Satterfield; Lt. Larry Savage; Lt. Charles D. Sennett, Jr.; Sgt. Ronald Frederick; Sgt. Vincent E. Hazzard; Sgt. Vincent May; Sgt. Kevin R. McKenna; Sgt. Robert Mock; Sgt. Charles H. Radcliffe; Sgt. Dennis P. Russell; Cpl. Nathaniel C. Payton; Cpl. Dale Lee Rains; C/O Michael J. Arabia; C/O Paul O. Barone; C/O Joshua A. Connor; C/O William Estrada; C/O Norman Figuera, Jr.; C/O Brett Foraker; C/O Lance N. Green; C/O Richard L. Griffith; C/O Michael Chester Landon, C/O Joshua Peppers; C/O Thomas Patrick Runyon, Jr.; C/O Joshua D. Stewart, C/O Abigail West, C/O Timothy R. Young, and C/O Aaron Forkum, and Lt. Brian Vanes have been involved personally, or been aware of and ratified the torture and abuse of inmates such as plaintiffs from February 2, 2017 on, including the following:

(A) physical abuse of defenseless non-resisting inmates, such as beating, punching, jumping on, spitting on them, shocking them with an electric shield, spraying pepper spray into their mouth, eyes and nose, pushing them to the ground and dragging so as to cause injury;

(B) verbal abuse of inmates, such as threats, obscenities and slurs directed to inmates based on their ethnic background or perceived sexual orientation;

(C) unjustified seizing, disposing of, or destroying inmates' personal property, often for retaliation or intimidation, and not for a legitimate penal purpose; and

(D) viciously abusing inmates while incognito, to try to impede their ability to file civil rights actions.

99. The intentional acts of these defendants constituted:

(A) Assault;

(B) Battery;

(C) Intentional infliction of emotional distress; and

(D) A violation of plaintiff's constitutional civil rights pursuant to *42 U.S.C.* § 1983 and their 8th Amendment right to be free of cruel and unusual punishment.

(E) Conspiracy to deny defendant's their constitutional rights by viciously abusing inmates while incognito, to try to impede their ability to file civil

rights actions.

100. Defendants and Former Commissioner Robert Coupe was aware of and ratified the conditions that led up to the torture and abuse of inmates at JTVCC and did nothing to stop it.

101. Their intentional acts constituted:

(A) Intentional infliction of emotional distress; and

(B) A violation of plaintiffs' constitutional civil rights pursuant to *42 U.S.C.* §1983 and their 8th Amendment right to be free of cruel and unusual punishment.

102. Defendants Former Commissioner Robert Coupe, Commissioner Perry Phelps, Warden Dana Metzger, Warden David Pierce, Warden Timothy Radcliff, and Lt. Brian Vanes were aware that Delaware's CERT would likely engage in torturing and abusing inmates on 2/2/17 when re-taking building C and did nothing to stop it.

103. All of the Defendants allowed the brutalization of the plaintiffs and others like them to occur since long before the events of February 1, 2017 and have conspired to deny defendant's their constitutional rights by permitting CO's to abuse inmates while incognito and by ignoring inmate abuse.

**COUNT I**
**24 USC 1983- CRUEL AND UNUSUAL PUNISHMENT**

104. The plaintiffs reallege paragraphs 1 through 103 above and incorporate them herein by reference.

105. All Defendants, directly or indirectly, have cooperated and participated with intentionally permitting the brutalization of the plaintiffs and others like them, before and after the events of February 1, 2017. The defendants intentionally and maliciously inflicted physical and emotional pain and suffering on the plaintiffs and other inmates similarly situated and deprived them of their property without due process.

106. Alternatively, the defendants knew the risk of harm to the plaintiffs and other inmates similarly situated from their abuse and misconduct, but nevertheless they acted with deliberate indifference, inflicting physical and emotional pain and suffering on the plaintiffs and other inmates similarly situated and depriving them of their property.

**COUNT II**
**42 USC 1983- CONSPIRACY**

107. The plaintiffs reallege paragraphs 1 through 103 above and incorporate them herein by reference.

108. The defendants agreed among themselves to deprive the plaintiffs and other inmates similarly situated of their constitutional rights, by permitting CO's to abuse inmates without fear of discipline and to abuse inmates incognito to try to

impede their ability to file civil rights actions.

109. In furtherance of the conspiracy, each defendant committed overt acts and was otherwise a willful participant in joint activity. Some committed acts of abuse and others intentionally did not meet their obligation to protect inmates from physical abuse.

110. The defendants who wore masks or balaclavas, and/or removed or obscured their name tags, and otherwise hid their identities did so in concert, by prior agreement, with the intent to brutalize inmates and take/break/destroy the inmates' personal belongings without fear of being identified and brought to justice, and thus to deprive the plaintiffs and other inmates similarly situated at JTVCC of their constitutional rights to possess property and be free of assault, battery, and offensive touching.

111. On most occasions, all CERT team members hid their identities, indicating prior agreement among themselves to protect each other from liability and embolden each other. One JTVCC employee admitted to the Independent Review Team that some CO's wore balaclavas for the express purpose of hiding their identities, but as far as the IRT report indicates, that employee did not name the balaclava wearers.

112. On at least one occasion, defendant Radcliffe accompanied CERT members who were wearing balaclavas and no legible name tags into a JTVCC

building, and he did not instruct them to remove the masks or properly display their name tags. Thus, the CO's knew that defendant Radcliffe and the JTVCC administration condoned, if not outright approved, of those identity-shielding practices, and the CO's continued those practices on subsequent shakedowns.

113. Some of the defendants conspired to coerce one or more plaintiffs into not making claims or filing grievances against them for their abuse. For example, defendants Scott, Figueroa, and Boyle broke plaintiff Purnell's hand on February 2, 2017, and his hand was in a cast or splint. In a shakedown on March 9, 2017, unidentifiable CERT members told him he wouldn't have to go through things like everybody else, such as strip searches and "getting [his] ass beat again" if he wrote a letter saying they didn't break his hand, but rather he made it all up. They told Purnell they would say they found it in his cell while conducting a shake down, and that would make "all of this go away." When Purnell did not immediately agree to the cover-up, the CERT members told him to get dressed but not put on the cast (splint). Then one told him to lay on the ground with his hands flat on the floor, and one or more officers stomped on his broken hand five to eight times. Any of the CERT members who did not stomp on Purnell's hand did nothing to stop or attempt to dissuade the ones who were stomping. Over an hour later, as he was being taken from the yard back to his cell, three or four unidentifiable officers told him to give the cast (splint) to them. At least one said, "Listen, n***er, I'm only telling you once

to hand your cast over or we'll use force. If you don't, we will light you up and break your other hand." None of the other CO's/CERT members contradicted those words or attempted to get the speaker to retract them.

114. On information and belief, the same and/or other defendant CO's made similar threats to coerce other inmates into not making claims or filing grievances against them and/or fellow officers for their abuse.

115. As direct and proximate results of the defendants' conspiracy, the plaintiffs and other inmates similarly situated at JTVCC suffered physical and emotional pain and suffering and deprivation of property.

116. As direct and proximate results of the defendants' misconduct, the plaintiffs and other inmates similarly situated at JTVCC suffered physical and emotional pain and suffering.

## COUNT IV
## INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

117. The plaintiffs reallege paragraphs 1 through 103 above and incorporate them herein by reference.

118. The defendant CERT members, CO's and supervisors of both, while in the scope of their employment, engaged in extreme, outrageous conduct rooted in the abuse of power and authority, with the intent to cause the plaintiffs to suffer severe emotional distress or with reckless disregard of the high probability that the

plaintiffs would suffer such distress.

119. As proximate results of those defendants' misconduct, the plaintiffs and other inmates similarly situated suffered severe emotional distress.

## COUNT V
## FAILURE TO PROPERLY TRAIN, MONITOR, SUPERVISE, OR DISCIPLINE

120. The plaintiffs reallege paragraphs 1 through 103 above and incorporate them herein by reference.

121. Defendants Phelps, Metzger, Parker, Pierce, Scarborough, McQueen, Carrothers and Radcliff and other defendants in intermediate supervisory positions, failed to exercise due care in the training, supervision, investigation, and discipline of the other defendants who are their subordinates to prevent the abuse and misconduct alleged above.

122. Defendant Radcliffe was present during at least one shakedown conducted by CERT members, observed the excessive force the CERT members used, heard their verbal abuse, including racial and homophobic slurs, and observed the vulgar manner in which the CERT members conducted strip searches, in clear violation of 28 CFR 115.6 (4)-(6) and 115.15, yet he did nothing to stop, ban, or even discourage that behavior, His failures in that regard made the situation worse for the plaintiffs and other inmates, since it was at least tacit approval of that barbaric and inhumane treatment.

123. The Independent Review Team deemed DOC's training practices substandard and ineffective in the summer of 2017, and it recommended additional training, but DOC has not implemented such training or followed up to determine if any such training was achieving the desired results. The IRT also determined that the JTVCC warden's November 2016 memo regarding disciplinary changes necessitated by the settlement of CLASI v. Coupe was "a passive aggressive attempt to force the implementation of the CLASI agreement to fail."

124. On information and belief Defendants Phelps, Coupe, Pierce, Metzger, Pierce, Carrothers, Parker, Timothy Radcliff and Scarborough have received grievances and other complaints about the actions of their subordinates detailed above, but they have failed to discipline those subordinates, intervene to prevent further misconduct, or make it clear to the subordinates that such misconduct would not be tolerated in the future.

125. On information and belief ,Defendants Phelps, Coupe, Pierce, Carrothers, Metzger, Parker, Timothy Radcliff and Scarborough, were aware of numerous pre-2017 instances of violence and/or excessive force by their subordinates, but they failed to discipline those subordinates, intervene to prevent further misconduct, or make it clear to the subordinates that such misconduct will not be tolerated in the future.

126. As direct and proximate results of the defendants' misconduct, the plaintiffs and other inmates similarly situated have suffered physical and emotional pain and suffering.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court grant the following relief:

1. Grant a jury trial on all claims triable;
2. Declare that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) and certifying the named plaintiffs as the proper representative of the class consisting of:
3. Declare that defendants' acts alleged above violate the Eighth Amendment to the Constitution by torturing and mistreating plaintiffs as alleged herein;
4. Preliminarily and permanently enjoin the defendants from pursuing the course of conduct complained of herein;

5. Preliminary and permanently enjoin the Defendants from pursuing settlement directly with any member of the putative over-detention Class described herein unless that person is represented by counsel;
6. Award all named plaintiffs and class members compensatory, consequential, and punitive damages in an amount to be determined at trial;
7. Appoint an independent monitor to supervise JTVCC or DOC, and report to the court, to ensure that inmates are no longer being abused at JTVCC and that those who abused the inmates have been disciplined accordingly;
8. Award plaintiff's attorneys' fees and costs incurred in bringing this action under *42 U.S.C.* § 1988 or Federal Rule of Civil Procedure 23 and grant such other relief as this Court deems just and proper.

WHEREFORE the plaintiffs, for themselves and other inmates similarly situated, respectfully request that this Court enter judgment in their favor and against the defendants, jointly and severally, for compensatory and punitive damages and injunctive relief from future recurrences of the defendants' abuse, misconduct, and

misuse of authority.

**GRADY & HAMPTON, LLC**

/s/ Stephen A. Hampton

Stephen A. Hampton (Bar ID# 2451)
6 North Bradford Street
Dover, DE 19904
(302) 678-1265

James J. Woods, Jr. (Bar ID#2035)
745 Stratford Drive
Encinitas, CA 92024
(302) 893-7585

*Attorneys for Plaintiffs*

Dated: April 30, 2020